[No. 29148-3-I.    Division One.    May 24, 1993.]

M. BRUCE ANDERSON, ET AL, *Appellants,* v. THE CITY
OF ISSAQUAH, *Respondent.*

*Rebekah R. Ross, Dennis D. Reynolds,* and *Williams, Kastner & Gibbs,* for appellants.

*Wayne D. Tanaka* and *Ogden Murphy Wallace,* for respondent.

*Linda M. Youngs* on behalf of American Institute of Architects, amicus curiae.

KENNEDY, J. — Appellants M. Bruce Anderson, Gary D. LaChance, and M. Bruce Anderson, Inc. (hereinafter referred to as Anderson), challenge the denial of their application for a land use certification, arguing, *inter alia*, that the building

design requirements contained in Issaquah Municipal Code (IMC) 16.16.060 are unconstitutionally vague. The Superior Court rejected this constitutional challenge. We reverse and direct that Anderson's land use certification be issued.[1]

The City of Issaquah cross-appeals, contending the trial court erroneously granted summary dismissal of its affirmative defenses. Anderson contends the cross appeal is wholly frivolous and seeks an award of reasonable attorney fees incurred in responding thereto. We affirm the trial court's summary dismissal of the affirmative defenses. We resolve our considerable doubts with respect to sanctions in favor of the City of Issaquah and deny Anderson's request for attorney fees.

## FACTS

Anderson owns property located at 145 N.W. Gilman Boulevard in the city of Issaquah (City). In 1988, Anderson applied to the City for a land use certification to develop the property. The property is zoned for general commercial use. Anderson desired to build a 6,800-square-foot commercial building for several retail tenants.

After obtaining architectural plans, Anderson submitted the project to various City departments for the necessary approvals. The process went smoothly until the approval of the Issaquah Development Commission (Development Commission) was sought. This commission was created to administer and enforce the City's land use regulations. It has the authority to approve or deny applications for land use certification.

Section 16.16.060 of the IMC enumerates various building design objectives which the Development Commission is required to administer and enforce. Insofar as is relevant to this appeal, the Development Commission is to be guided by the following criteria:

---

[1]Anderson raises additional issues which we need not address in view of our determination that the land use certification was denied based on an unconstitutionally vague ordinance which was applied in an *ad hoc* manner.

IMC 16.16.060(B). Relationship of Building and Site to Adjoining Area.

1. Buildings and structures shall be made compatible with adjacent buildings of conflicting architectural styles by such means as screens and site breaks, or other suitable methods and materials.

2. Harmony in texture, lines, and masses shall be encouraged.

. . . .

IMC 16.16.060(D). Building Design.

1. Evaluation of a project shall be based on quality of its design and relationship to the natural setting of the valley and surrounding mountains.

2. Building components, such as windows, doors, eaves and parapets, shall have appropriate proportions and relationship to each other, expressing themselves as a part of the overall design.

3. Colors shall be harmonious, with bright or brilliant colors used only for minimal accent.

4. Design attention shall be given to screening from public view all mechanical equipment, including refuse enclosures, electrical transformer pads and vaults, communication equipment, and other utility hardware on roofs, grounds or buildings.

5. Exterior lighting shall be part of the architectural concept. Fixtures, standards and all exposed accessories shall be harmonious with the building design.

6. Monotony of design in single or multiple building projects shall be avoided. Efforts should be made to create an interesting project by use of complimentary details, functional orientation of buildings, parking and access provisions and relating the development to the site. In multiple building projects, variable siting of individual buildings, heights of buildings, or other methods shall be used to prevent a monotonous design.

As initially designed, Anderson's proposed structure was to be faced with off-white stucco and was to have a blue metal roof. It was designed in a "modern" style with an unbroken "warehouse" appearance in the rear, and large retail-style windows in the front. The City moved a Victorian era residence, the "Alexander House", onto the neighboring property to serve as a visitors' center. Across the street from the Anderson site is a gasoline station that looks like a gasoline station. Located nearby and within view from the proposed building site are two more gasoline stations, the First Mutual Bank Building built in the "Issaquah territorial style", an

Elks hall which is described in the record by the Mayor of Issaquah as a "box building", an auto repair shop, and a veterinary clinic with a cyclone-fenced dog run. The area is described in the record as "a natural transition area between old downtown Issaquah and the new village style construction of Gilman [Boulevard]."

The Development Commission reviewed Anderson's application for the first time at a public hearing on December 21, 1988. Commissioner Nash commented that "the facade did not fit with the concept of the surrounding area." Commissioner McGinnis agreed. Commissioner Nash expressed concern about the building color and stated that he did not think the building was compatible with the image of Issaquah. Commissioner Larson said that he would like to see more depth to the building facade. Commissioner Nash said there should be some interest created along the blank back wall. Commissioner Garrison suggested that the rear facade needed to be redesigned.[2]

At the conclusion of the meeting, the Development Commission voted to continue the hearing to give Anderson an opportunity to modify the building design.

On January 18, 1989, Anderson came back before the Development Commission with modified plans which included changing the roofing from metal to tile, changing the color of the structure from off-white to "Cape Cod" gray with "Tahoe" blue trim, and adding brick to the front facade. During the ensuing discussion among the commissioners, Commissioner Larson stated that the revisions to the front facade had not satisfied his concerns from the last meeting. In response to Anderson's request for more specific design guidelines, Commissioner McGinnis stated that the Development Commission had "been giving direction; it is the applicant's responsibility to take the direction/suggestions and incorporate them into a revised plan that reflects the changes." Commissioner Larson then sug-

---

[2]The minutes of this and the other commission hearings for this project reflect that parking, signs, building security, and landscaping were also discussed. We include here only those comments contained in the various minutes which relate to building design.

gested that "[t]he facade can be broken up with sculptures, benches, fountains, etc." Commissioner Nash suggested that Anderson "drive up and down Gilman and look at both good and bad examples of what has been done with flat facades."

As the discussion continued, Commissioner Larson stated that Anderson "should present a [plan] that achieves what the Commission is trying to achieve through its comments/suggestions at these meetings" and stated that "architectural screens, fountains, paving of brick, wood or other similar method[s] of screening in lieu of vegetative landscaping are examples of design suggestions that can be used to break up the front facade." Commissioner Davis objected to the front facade, stating that he could not see putting an expanse of glass facing Gilman Boulevard. "The building is not compatible with Gilman." Commissioner O'Shea agreed. Commissioner Nash stated that "the application needs major changes to be acceptable." Commissioner O'Shea agreed. Commissioner Nash stated that "this facade does not create the same feeling as the building/environment around this site."

Commissioner Nash continued, stating that he "personally like[d] the introduction of brick and the use of tiles rather than metal on the roof." Commissioner Larson stated that he would like to see a review of the blue to be used: "Tahoe blue may be too dark." Commissioner Steinwachs agreed. Commissioner Larson noted that "the front of the building could be modulated [to] have other design techniques employed to make the front facade more interesting."

With this, the Development Commission voted to continue the discussion to a future hearing.

On February 15, 1989, Anderson came back before the Development Commission. In the meantime, Anderson's architects had added a 5-foot overhang and a 7-foot accent overhang to the plans for the front of the building. More brick had been added to the front of the building. Wood trim and accent colors had been added to the back of the building and trees were added to the landscaping to further break up the rear facade.

Anderson explained the plans still called for large, floor to ceiling windows as this was to be a retail premises: "[A] glass front is necessary to rent the space . . .". Commissioner Steinwachs stated that he had driven Gilman Boulevard and taken notes. The following verbatim statement by Steinwachs was placed into the minutes:

*"My General Observation From Driving Up and Down Gilman Boulevard".*
I see certain design elements and techniques used in various combinations in various locations to achieve a visual effect that is sensitive to the unique character of our Signature Street. I see heavy use of brick, wood, and tile. I see minimal use of stucco. I see colors that are mostly earthtones, avoiding extreme contrasts. I see various methods used to provide modulation in both horizontal and vertical lines, such as gables, bay windows, recesses in front faces, porches, rails, many vertical columns, and breaks in roof lines. I see long, sloping, conspicuous roofs with large overhangs. I see windows with panels above and below windows. I see no windows that extend down to floor level. This is the impression I have of Gilman Boulevard as it relates to building design.

Commissioner Nash agreed stating, "[T]here is a certain feeling you get when you drive along Gilman Boulevard, and this building does not give this same feeling." Commissioner Steinwachs wondered if the applicant had any option but to start "from scratch". Anderson responded that he would be willing to change from stucco to wood facing but that, after working on the project for 9 months and experiencing total frustration, he was not willing to make additional design changes.

At that point, the Development Commission denied Anderson's application, giving four reasons:

1. After four [*sic*] lengthy review meetings of the Development Commission, the applicant has not been sufficiently responsive to concerns expressed by the Commission to warrant approval or an additional continuance of the review.
2. The primary concerns expressed relate to the building architecture as it relates to Gilman Boulevard in general, and the immediate neighborhood in particular.
3. The Development Commission is charged with protecting, preserving and enhancing the aesthetic values that have

established the desirable quality and unique character of Issaquah, reference IMC 16.16.010C.[3]

4. We see certain design elements and techniques used in various combinations in various locations to achieve a visual effect that is sensitive to the unique character of our Signature Street. On Gilman Boulevard we see heavy use of brick, wood and tile. We see minimal use of stucco. We see various methods used to provide both horizontal and vertical modulation, including gables, breaks in rooflines, bay windows, recesses and protrusions in front face. We see long, sloping, conspicuous roofs with large overhangs. We see no windows that extend to ground level. We see brick and wood panels at intervals between windows. We see earthtone colors avoiding extreme contrast.

Anderson, who by this time had an estimated $250,000 into the project, timely appealed the adverse ruling to the Issaquah City Council (City Council). After a lengthy hearing and much debate, the City Council decided to affirm the Development Commission's decision by a vote of 4 to 3.

The City Council considered formal written findings and conclusions on April 3, 1989. The City Council verbally adopted its action on that date but required that certain changes be made to the proposed findings and conclusions. Those changes were made and the final findings and conclusions were signed on April 5, 1989 (backdated to April 3). On April 5, a notice of action was issued to Anderson, stating that he had 14 days *from the date of that notice* in which to file any appeal.

Thirteen days later, on April 18, 1989, Anderson filed a complaint in King County Superior Court. The lawsuit was initially brought in the names of M. Bruce Anderson and Gary D. LaChance. At this time, LaChance still owned the property. On June 19, 1989, LaChance sold the property to M. Bruce Anderson, Inc. The complaint was amended by stipulation to add the corporation as a party plaintiff, with-

---

[3]IMC 16.16.010(C) provides that one of the purposes of the code is "[t]o protect, preserve and enhance the social, cultural, economic, environmental and aesthetic values that have established the desirable quality and unique character of Issaquah[.]"

out prejudice to the City's right to argue that the corporation had been an indispensable party before the sale closed. The Washington State Attorney General was not named as a defendant. On August 28, 1990, prior to trial, the Attorney General was served.[4] The Attorney General declined the opportunity to participate in the action and waived notice of any further proceedings.

In responding to the action, the City interposed affirmative defenses, alleging that the complaint had been filed 1 day past the 14-day deadline established by IMC 1.32.040; and that Anderson had failed to name an indispensable party, the Attorney General. Later, the City argued that M. Bruce Anderson, Inc., should have been joined initially. Prior to trial, these affirmative defenses were stricken, following the grant of Anderson's request for summary judgment thereon.

Following trial, the court dismissed Anderson's complaint, rejecting the same claims now raised in this appeal.

## DISCUSSION

### 1. Cross Appeal.

We first address the issues raised in the cross appeal, as a ruling in favor of the City on those issues would obviate Anderson's appeal.

By bringing the cross appeal the City has come within a hair's breadth of incurring sanctions under RAP 18.9 (frivolous appeal). We exercise our discretion and deny Anderson's request for sanctions primarily because the City is technically correct that, under *Birch Bay Trailer Sales, Inc. v. Whatcom Cy.*, 65 Wn. App. 739, 829 P.2d 1109, *review denied*, 119 Wn.2d 1023 (1992) and *DiGiovanni v. Tukwila*, 54 Wn. App. 627, 774 P.2d 1244 (1989), *review denied*, 114 Wn.2d 1001 (1990), the date of the City's "decision" was April 3, 1989, rather than April 5, 1989, when the formal

---

[4]Anderson was/is challenging the constitutionality of an Issaquah city ordinance. RCW 7.24.110 provides that when declaratory relief is sought that a municipal ordinance is unconstitutional, the Attorney General shall be served and shall be entitled to be heard. The statute does not require that the Attorney General be named as a party.

written findings and conclusions were actually signed.[5] *But see North St. Ass'n v. Olympia*, 96 Wn.2d 359, 361, 369-70, 635 P.2d 721 (1981) (30-day period in which to file a petition for writ of review did not commence to run from date of oral decision but rather from date of official notice of decision), *disapproved on other grounds in Sidis v. Brodie/Dohrmann, Inc.*, 117 Wn.2d 325, 815 P.2d 781 (1991).

■ Although the issue here raised is not in and of itself frivolous, we hold that the City waived the right to argue this issue when, on April 5, 1989, it sent Anderson a notice stating that Anderson had 14 days from the date of *that notice* to file an appeal.[6] Therefore, we need not decide the issue and decline to do so.

■ The City's claim that M. Bruce Anderson, Inc., should have been named as a party plaintiff at a time before the corporation purchased the property here in issue is wholly frivolous. A property owner in an action such as this is a necessary and indispensable party, *Veradale Vly. Citizens' Planning Comm. v. Board of Cy. Comm'rs*, 22 Wn. App. 229, 232-33, 588 P.2d 750 (1978), but the Anderson *corporation* did not become the owner of this property until June 1989.[7] We hold that the corporation did not become an indispensable party until it purchased the property, by which time M. Bruce Anderson, Inc., had been joined as a party. *See* CR 15(c).

■ Finally, the City argues that Anderson's failure to promptly serve the Attorney General is fatal to the claim. RCW 7.24.110 does require that the Attorney General be served, although no time limit is stated. In *Kendall v. Douglas, Grant, Lincoln & Okanogan Cys. Pub. Hosp. Dist. 6*, 118

---

[5] IMC 1.32.040 requires that any appeal to the superior court be filed within 14 days of the City Council's "decision".

[6] The existence of this notice was not revealed to this court by the City. Anderson pointed it out in the reply brief responding to the cross appeal.

[7] The City also failed to point out *this* relevant fact to this court. Anderson pointed it out in the reply brief. This court is not favorably impressed by the City's lack of candor.

Wn.2d 1, 11-12, 820 P.2d 497 (1991), our Supreme Court affirmed the dismissal of a claim which challenged the facial constitutionality of a state statute because the Attorney General had never been served. In *Leonard v. Seattle*, 81 Wn.2d 479, 503 P.2d 741 (1972), an assistant attorney general, although that office had never been served, appeared specially at trial and testified that the Attorney General's office was (at that time) being served with more than 250 such cases a year and that, had the Attorney General's office been served in that case, it would have waived any right to participate in the litigation. *Leonard*, 81 Wn.2d at 482-83. The *Leonard* court held that, although service upon the Attorney General is jurisdictional in a general sense, such service is subject to waiver by the Attorney General and had been waived in that case. *Leonard*, 81 Wn.2d at 482.

In *Zimmer v. Seattle*, 19 Wn. App. 864, 869-70, 578 P.2d 548 (1978), the Attorney General was served, although it is not clear from the decision just when this was done. The Attorney General's office waived the opportunity to participate. This court noted that "the attorney general is not obliged to appear" and he or she may waive the requirement of service. *Zimmer*, 19 Wn. App. at 869-70 (citing *Leonard*, 81 Wn.2d at 482).

We hold that the Attorney General's pretrial waiver of the statutory opportunity to intervene is dispositive of this issue. *Leonard* clearly controls. If the Attorney General may waive the total failure to serve, he or she most certainly can waive "late" service.[8]

■ Because "all doubts as to whether [an] appeal is frivolous should be resolved in favor of the appellant", *Millers Cas. Ins. Co. v. Briggs*, 100 Wn.2d 9, 15, 665 P.2d 887 (1983) (quoting *Streater v. White*, 26 Wn. App. 430, 435, 613 P.2d 187, *review denied*, 94 Wn.2d 1014 (1980)), we resolve the close issue of whether the cross appeal is wholly frivolous in

---

[8]We do not hold that the service here was "late". The statute does not require that the Attorney General be named as a party and no deadline for service is contained in RCW 7.24.110.

favor of the City. Accordingly, we deny Anderson's request for sanctions for a frivolous cross appeal.

██ ██ 2. Constitutionality of IMC 16.16.060 (Building Design Provisions).

> [A] statute which either forbids or requires the doing of an act in terms so vague that men [and women] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

*Connally v. General Constr. Co.*, 269 U.S. 385, 391, 70 L. Ed. 322, 46 S. Ct. 126 (1926). *See also State v. Reader's Digest Ass'n, Inc.*, 81 Wn.2d 259, 273, 501 P.2d 290 (1972), *appeal dismissed*, 411 U.S. 945 (1973); *Burien Bark Supply v. King Cy.*, 106 Wn.2d 868, 871, 725 P.2d 994 (1986). In the field of regulatory statutes governing business activities, statutes which employ technical words which are commonly understood within an industry, or which employ words with a well-settled common law meaning, generally will be sustained against a charge of vagueness. *Reader's Digest Ass'n*, 81 Wn.2d at 273-74. The vagueness test does not require a statute to meet impossible standards of specificity. *Chicago, M., St. P. & P.R.R. v. State Human Rights Comm'n*, 87 Wn.2d 802, 805, 557 P.2d 307 (1976).

██ In the area of land use, a court looks not only at the face of the ordinance but also at its application to the person who has sought to comply with the ordinance and/or who is alleged to have failed to comply. *Burien Bark Supply*, 106 Wn.2d at 871; *Grant Cy. v. Bohne*, 89 Wn.2d 953, 955, 577 P.2d 138 (1978). The purpose of the void for vagueness doctrine is to limit arbitrary and discretionary enforcements of the law. *Burien Bark Supply*, 106 Wn.2d at 871.

Looking first at the face of the building design sections of IMC 16.16.060, we note that an ordinary citizen reading these sections would learn only that a given building project should bear a good relationship with the Issaquah Valley and surrounding mountains; its windows, doors, eaves and parapets should be of "appropriate proportions", its colors should be "harmonious" and seldom "bright" or "brilliant";

its mechanical equipment should be screened from public view; its exterior lighting should be "harmonious" with the building design and "monotony should be avoided." The project should also be "interesting". IMC 16.16.060(D)(1)-(6). If the building is not "compatible" with adjacent buildings, it should be "made compatible" by the use of screens and site breaks "or other suitable methods and materials." "Harmony in texture, lines, and masses [is] encouraged." The landscaping should provide an "attractive . . . transition" to adjoining properties. IMC 16.16.060(B)(1)-(3).

As is stated in the brief of amicus curiae,[9] we conclude that these code sections "do not give effective or meaningful guidance" to applicants, to design professionals, or to the public officials of Issaquah who are responsible for enforcing the code. Brief of Amicus Curiae, at 1. Although it is clear from the code sections here at issue that mechanical equipment must be screened from public view and that, probably, earthtones or pastels located within the cool and muted ranges of the color wheel are going to be preferred, there is nothing in the code from which an applicant can determine whether his or her project is going to be seen by the Development Commission as "interesting" versus "monotonous" and as "harmonious" with the valley and the mountains. Neither is it clear from the code just what else, besides the valley and the mountains, a particular project is supposed to be harmonious with, although "[h]armony in texture, lines, and masses" is certainly encouraged. IMC 16.16.060(B)(2).[10]

In attempting to interpret and apply this code, the commissioners charged with that task were left with only their own individual, subjective "feelings" about the "image of Issaquah" and as to whether this project was "compatible" or

[9]The amicus curiae is the Seattle Chapter of the American Institute of Architects, the Washington Council of the American Institute of Architects, and the Washington Chapter of the American Society of Landscape Architects.

[10]Apparently a particular building need not be particularly compatible with the design of an adjacent building in that it can be "made compatible" by the use of "screens and site breaks". IMC 16.16.060(B)(1).

"interesting". The commissioners stated that the City was "making a statement" on its "signature street"[11] and invited Anderson to take a drive up and down Gilman Boulevard and "look at good and bad examples of what has been done with flat facades." One commissioner drove up and down Gilman, taking notes, in a no doubt sincere effort to define that which is left undefined in the code.[12]

The point we make here is that neither Anderson nor the commissioners may constitutionally be required or allowed to guess at the meaning of the code's building design requirements by driving up and down Gilman Boulevard looking at "good and bad" examples of what has been done with other buildings, recently or in the past. We hold that the code sections here at issue are unconstitutionally vague on their face. The words employed are not technical words which are commonly understood within the professional building design industry. Neither do these words have a settled common law meaning.

■ As they were applied to Anderson, it is also clear the code sections at issue fail to pass constitutional muster. Because the commissioners themselves had no objective guidelines to follow, they necessarily had to resort to their own subjective "feelings". The "statement" Issaquah is apparently trying to make on its "signature street" is not written in the code. In order to be enforceable, that "statement" must be written down in the code, in understandable terms.[13] *See*,

---

[11]The term "signature street" is not defined in the ordinance here at issue.

[12]Although Commissioner Steinwachs stated that he saw heavy use of brick, wood and tile, minimal use of stucco, many gables, bay windows, and long, sloping vertical roofs, it is clear from the record that also to be seen on Gilman Boulevard are a number of approved and completed projects that do not bear these characteristics. Examples include a Schuck's Auto Supply store at 607 N.W. Gilman Boulevard; a strip mall known as Town and Country Square at 1135 Gilman Boulevard; a Mobil gasoline station located at 55 N.W. Gilman Boulevard and a Skipper's restaurant located at the southeast corner of Front Street and Gilman Boulevard.

[13]We reject the City's argument that Issaquah's comprehensive plan and its I-90 subarea amendment when read in conjunction with IMC 16.16.060 fills in the constitutional gap. The comprehensive plan contains only very general

*e.g., Morristown Road Assocs. v. Mayor & Common Coun. & Planning Bd.*, 163 N.J. Super. 58, 394 A.2d 157 (1978). The unacceptable alternative is what happened here. The commissioners enforced not a building design code but their own arbitrary concept of the provisions of an unwritten "statement" to be made on Gilman Boulevard. The commissioners' individual concepts were as vague and undefined as those written in the code. This is the very epitome of discretionary, arbitrary enforcement of the law.

Councilwoman McHenry said it very well during the appeal to the City Council:

> [M]aybe we haven't done a good job in . . . communicating what kind of image we want. We all want an image. I bet you if I stated my image it would be certainly different from everyone of you here and everyone in the audience. . . . [I]f we want a specific design, I agree with proponent's counsel, and that is that we come up with a specific district design . . . We don't have such a design requirement. So we all have to rely on some gut feel. And often times this gut feel gets us into trouble because it could be misinterpreted or misconstrued . . .[.]

Although the City argues that its code is not unconstitutionally vague, it primarily relies upon the procedural safeguards contained in the code. Because aesthetic considerations are subjective in concept, the City argues that they cannot be reduced to a formula or a number. The vagueness test does not require a statute to meet impossible standards of specificity. *Chicago, M., St. P. & P.R.R. v. State Human Rights Comm'n*, 87 Wn.2d at 805.

█ As well illustrated by the appendices to the brief of amicus curiae, aesthetic considerations are not impossible to define in a code or ordinance.[14] Moreover, the procedural

---

statements of policy, criteria, and goals. By the terms of the plan, the City stated its intention to enact and enforce specific regulations in order to carry out the comprehensive plan. It is one of these regulations that is at issue here.

[14]Appendix A to the brief of amicus curiae is a portion of the design objectives plan for entryway corridors for Bozeman, Montana. Appendix B is a portion of the development code for San Bernardino, California. Both codes contain extensive written criteria illustrated by schematic drawings and photographs. The illustrations clarify a number of concepts which otherwise might be difficult to describe with the requisite degree of clarity.

safeguards contained in the Issaquah Municipal Code (providing for appeal to the City Council and to the courts) do not cure the constitutional defects here apparent. The City relies heavily upon *Barry & Barry, Inc. v. Department of Motor Vehicles*, 81 Wn.2d 155, 500 P.2d 540 (1972), *appeal dismissed*, 410 U.S. 977 (1973) and argues that, under that case, a city need only provide standards and guidelines that define in very general terms what is to be done, and by whom, together with sufficient procedural safeguards to control arbitrary administration. *See also State ex rel. Standard Mining & Dev. Corp. v. Auburn*, 82 Wn.2d 321, 510 P.2d 647 (1973) (applying *Barry* to an Auburn zoning ordinance).

In *Barry*, the Washington Supreme Court decided first that the Washington Legislature had indeed delegated to the Director of the Department of Motor Vehicles the authority to promulgate a schedule of maximum fees which could be charged by employment agencies. The second question before the court was whether this was an unconstitutional delegation of legislative authority because of the absence of adequate legislative standards. The court held that it was not. "[T]he best way to work out policy is often for the legislative body to avoid generalization and to assign to an administrative agency the task of working out such policy on a case-by-case basis." *Barry*, 81 Wn.2d at 160 (citing 1 K. Davis, *Administrative Law Treatise* § 2.08 (1958)).

It is clear, however, that the *Barry* court did not have in mind judicial approval of the kind of *ad hoc* case-by-case policymaking which Anderson experienced before the Issaquah Development Commission:

> The non-delegation doctrine can and should be altered to turn it into an effective and useful judicial tool. Its purpose should no longer be either to prevent delegation of legislative power or to require meaningful statutory standards; its purpose should be the much deeper one of protecting against unnecessary and uncontrolled discretionary power. . . . The focus of judicial inquiries thus should shift from statutory standards to administrative safeguards and administrative standards. As soon as that shift is accomplished, the protections should grow beyond the non-delegation doctrine to a much broader requirement, judicially enforced, that as far as

> is practicable administrators must structure their discretion-
> ary power through appropriate safeguards and must confine
> and guide their discretionary power through standards, prin-
> ciples, and rules.

*Barry*, 81 Wn.2d at 161 (quoting 1 K. Davis, *Administrative Law Treatise* § 2.00 (Supp. 1970)). In *Barry*, the Legislature authorized the Director of the Department of Motor Vehicles to adopt a *uniform* fee schedule, not to decide fee issues arbitrarily on a case-by-case basis. The Director was required to establish and publish the uniform standards, principles, and rules by which all employment agencies would be governed. *Barry* does not suggest that an administrative agency acting in the absence of clear legislative guidelines may arbitrarily impose vague, unarticulated and unpublished standards upon the public.

In *Standard Mining & Dev. Corp.*, the Supreme Court dealt with the comprehensive plan and certain zoning regulations adopted by the City of Auburn to govern special use permits for gravel pit operations. The appellant mining company argued that the zoning regulation governing special use permits was invalid in that it contained no standards to guide the city council in formulating the conditions which shall attach to such permits. The Supreme Court responded to this argument as follows:

> As we recently indicated in *Barry & Barry, Inc. v. Depart-
> ment of Motor Vehicles*, 81 Wn.2d 155, 500 P.2d 540 (1972), the
> specification of standards is not always appropriate in admin-
> istrative actions. The function of prescribing the conditions
> under which a special use permit may be enjoyed is one to
> which this principle is applicable. Only rarely will the environ-
> mental factors affecting different special use applications be
> the same. Generally speaking, the conditions imposed must
> necessarily differ from case to case. This does not mean that
> the applicant is denied due process of law or the equal protec-
> tion of the laws — so long as he is granted a hearing, a right of
> appeal, and a chance to show that the conditions are unrea-
> sonable, that is, unnecessarily burdensome or unrelated to the
> purpose which they are legitimately designed to serve.

*Standard Mining & Dev. Corp.*, 82 Wn.2d at 330-31.

The *Standard Mining* court pointed out that Auburn's comprehensive plan dealt extensively with the numerous

deposits of sand and gravel located within the Auburn city limits and that an applicant may appeal the imposition of conditions placed on a special use permit on the basis that the conditions are unduly burdensome or not reasonably calculated to achieve the purposes set forth in the comprehensive plan. *Standard Mining & Dev. Corp.*, 82 Wn.2d at 331-32. Issaquah argues that Anderson is in the same position and, accordingly, that *Standard Mining* dictates that we must affirm. We disagree and hold that the principles of *Barry* as applied in *Standard Mining* do not apply to the code sections here at issue. Instead, we adopt the approach of the New Jersey court in *Morristown Road Assocs.*, 163 N.J. Super. at 67-68. A design review ordinance must contain workable guidelines. Too broad a discretion permits determinations based upon whim, caprice, or subjective considerations.

Certainly, the IMC grants Anderson the right to appeal the adverse decision of the Development Commission. But just as IMC 16.16.060 provides no standards by which an applicant or the Development Commission or the City Council can determine whether a given building design passes muster under the code, it provides no ascertainable criteria by which a court can review a decision at issue, regardless of whether the court applies the arbitrary and capricious standard as the City argues is appropriate or the clearly erroneous standard as Anderson argues is appropriate. Under either standard of review, the appellate process is to no avail where the statute at issue contains no ascertainable standards and where, as here, the Development Commission was not empowered to adopt clearly ascertainable standards of its own.[15] The procedural safeguards provided here do not save the ordinance.

Anderson has argued strenuously in this appeal that a municipality has no power to deny a proposed development for aesthetic reasons alone. Anderson argues this issue is "settled" by Washington case law. *See Polygon Corp. v. Seattle*, 90 Wn.2d 59, 70, 578 P.2d 1309 (1978); *Duckworth v.*

---

[15]We do not decide whether such authority *could have been delegated* to this commission. Such authority was not delegated here.

*Bonney Lk.*, 91 Wn.2d 19, 30, 586 P.2d 860 (1978); *Victoria Tower Partnership v. Seattle*, 59 Wn. App. 592, 603, 800 P.2d 380 (1990) (holding a city can consider aesthetic impacts only "along with other adverse impacts"), *review denied*, 116 Wn.2d 1012 (1991). Relying on these same cases, the City argues that, although Anderson's land use certification admittedly was denied solely on the basis of aesthetics, IMC 16.16 is valid because aesthetic concerns are only one of the bases contained in the code for the exercise of police power relating to land use. The amicus points out that the modern view is that aesthetics alone will justify a regulation, provided that there are adequate standards and they are appropriately applied. *See* 1 A. & D. Rathkopf, *Zoning and Planning* § 14.02[4] (1986).

We believe the issue of whether a community can exert control over design issues based solely on accepted community aesthetic values is far from "settled" in Washington case law. The possibility certainly has not been foreclosed by our Supreme Court. *See Polygon*, 90 Wn.2d at 70 ("While this court has not held that aesthetic factors alone will support an exercise of the police power, such considerations taken together with other factors can support such action."). *See also Duckworth*, 91 Wn.2d at 30 ("While we have indicated that aesthetic considerations alone *may* not support invocation of the police powers . . .". (Italics ours.))

██ Clearly, however, aesthetic standards are an appropriate *component* of land use governance. Whenever a community adopts such standards they can and must be drafted to give clear guidance to all parties concerned. Applicants must have an understandable statement of what is expected from new construction. Design professionals need to know in advance what standards will be acceptable in a given community. It is unreasonable to expect applicants to pay for repetitive revisions of plans in an effort to comply with the unarticulated, unpublished "statements" a given community may wish to make on or off its "signature street". It is equally unreasonable, and a deprivation of due process, to

expect or allow a design review board such as the Issaquah Development Commission to create standards on an *ad hoc* basis, during the design review process.

CONCLUSION

It is not disputed that Anderson's project meets all of the City's land use requirements except for those unwritten and therefore unenforceable requirements relating to building design which the Development Commission unsuccessfully tried to articulate during the course of several hearings. We order that Anderson's land use certification be issued, provided however, that those changes which Anderson agreed to through the hearing before the City Council may validly be imposed.

SCHOLFIELD and GROSSE, JJ., concur.