62 P.3d 938 (2003)
PINECREST HOMEOWNERS ASSOCIATION, Rockwood Neighborhood Council and its President Pam Behring, Josh Burrows, an individual, John and Diane Scelfo, a marital community, Tighe and Marybeth Smith, a marital community, Dale and Carol Ruemping, a marital community, Brian and Tanya Rekofke, a marital community, Steve and Marty Schmauch, a marital community, Andrew Boulet, an individual, Barbara McGann, an individual, and Del and Maggie Schueneman, a marital community, Appellants,
v.
GLEN A. CLONINGER ASSOCIATES, and the City of Spokane, a municipal corporation of the State of Washington, Respondents.
No. 20916-4-III.
Court of Appeals of Washington, Division 3, Panel Four.
February 13, 2003.
*939 Frederick J. Dullanty, Stanley M. Schwartz, Witherspoon, Kelley, Davenport & Toole, Spokane, WA, for Appellants.
Joseph P. Delay, Delay, Curran, Thompson, Pontarolo & Walker, Michael J. Piccolo, Office of City Attorney, Spokane, WA, for Respondents.
SWEENEY, J.
This land use case presents two issues, one procedural and one substantive. The procedural question is whether the case has been rendered moot because a building permit has been issued for a challenged project, construction is proceeding, and the homeowners have not superseded or tried to enjoin development. We conclude that the homeowners are not required to either enjoin or supersede an adverse zoning decision to proceed with this appeal. The substantive question is whether the City of Spokane, acting through its City Council, can authorize a zone change based on the Comprehensive Plan, absent specific zoning regulations (regulations which were anticipated by the Plan but never promulgated). We conclude that it cannot. We therefore reverse the judgment of the trial court that affirmed the City's rezone.

FACTS
Glen A. Cloninger & Associates owns an 8.47-acre parcel of property in an area of the City of Spokane known as Lincoln Heights. It wants to rezone the property to develop what is called "mixed use." Mixed use includes a close mix of retail, office, and residential uses. The City Comprehensive Plan would accommodate the mixed-use zoning. But the City has not yet enacted a zoning ordinance implementing the mixed-use designation.
For this reason, a City hearings examiner denied Cloninger's request for a rezone. The City Council however reversed that decision and ordered that the application for rezone be processed in accordance with "concepts" for mixed use set out in the City's Comprehensive Plan, and particularly the Lincoln Heights Specific Plan.
ZONING HISTORY
The zoning history of the property is not disputed.
In 1991 the property was rezoned from multi-family to RO-1L (limited residential office, category 1). This classification allowed development of an office park. No offices were built.
In 1992, the property was rezoned to RO-2 (residential office, category 2). This was done to accommodate the development of a restaurant. The restaurant was built.
In 1998, the Spokane City Council changed the Lincoln Heights Specific Plan, a component of the City's Comprehensive Plan, to accommodate a large office development. It did so only after adding 14 "concepts" applicable to such a development. We set them out in detail because they later provide the basis for the City's decision to rezone.
Proposals that qualify for the mixed use designation and incorporate mixed uses in a comprehensive site development should demonstrate compliance with the following concepts:
1. To enable development of integrated, mixed use communities, containing a variety of housing types arranged around an activity center (neighborhood, district, *940 corridor); that provide a pleasant living, shopping, and working environment; that provide a sense of community; and that provide a balance of compatible retail, office, residential, recreational and public uses.
2. To enable a land use pattern that will reduce dependence on automobile use, especially drive-alone vehicle use during morning and evening commute hours.
3. To enable the design of new development in a manner that will ensure the safe and efficient movement of goods and people.
4. To provide direct, convenient pedestrian, bicycle and vehicular access between residences and nearby activity centers, in order to facilitate pedestrian and bicycle travel and reduce the number and length of automobile trips.
5. To discourage automobile dominated businesses, which are characterized by drive-in and drive-through facilities that allow people to remain in their vehicles while receiving products or services, and uses that traditionally require large amounts of off-street parking.
6. To provide sufficient housing density to enable cost-effective extension of utilities, services, and streets; facilitate frequent transit service; and to help sustain neighborhood businesses.
7. To enable many of the community's residents to live within one fourth (1/4) mile of a grocery store and transit stop.
8. To ensure that activity centers are arranged, scaled and designed to be compatible with surrounding land uses and provide transitions between significantly different land uses (e.g. commercial and residential uses).
9. To ensure that buildings and other development components are arranged, designed and oriented to facilitate pedestrian access and access for transit.
10. To allow innovative site and building designs while providing for design harmony and continuity (e.g. coordinated architectural styles, street trees, lighting, signage and benches).
11. To ensure adequate light, air, privacy and readily accessible open space for each dwelling unit in order to maintain public health, safety and welfare.
12. To provide for appropriately located community open spaces for informal social activity, recreation and aesthetic enhancement of the development.
13. To provide mixed use development with a character that is less physically and visually intrusive than traditional commercial centers, districts and strips.
14. To insure the mixed use development does not undermine the buffer concept described in subsection "e" of this policy.
Clerk's Papers (CP) at 121-22.
In December 1999, the City Council directed the city planning commission to "develop and forward to the Spokane City Council for approval mixed use zoning regulations." CP at 59. To date no mixed use zoning regulations have been prepared or, of course, adopted.
In May 2000 the city planning director responded to a letter from Cloninger, suggesting that it apply for a zone change to RO 1D (high density residence/office design zone) to facilitate the proposed mixed-use development. Spokane Municipal Code (SMC) 11.19.249.[1]
Cloninger applied for the zone change, an amendment to its original planned unit development (PUD), and a special permit for a project.
*941 In July of 2000, the city design review committee recommended approval of the PUD amendment and issuance of a special permit for the project, subject to Cloninger's more fully addressing certain policy considerations set out in the Lincoln Heights Specific Plan.
The city planning and zoning staff however recommended denial of the application because no mixed-use zoning regulations were in place.
In December of 2000, following a series of hearings, a City hearings examiner denied Cloninger's application for a zone change. He did so "subject to the development of appropriate zoning regulations and design review criteria." CP at 217. He concluded that the guidance offered by the Lincoln Heights Specific Plan was "too vague" to evaluate the project:
The vagueness of the policy guidance does not allow the applicant, Staff, or the neighborhood to know, with clarity, exactly what is being proposed and what is, in fact, allowed by these policies.
CP at 212.
In January 2001, the hearings examiner denied a motion for reconsideration. Cloninger appealed to the City Council.
On April 2, 2001, in a decision written by City Council Member Stephen K. Eugster, the Council reversed the decision of the hearings examiner and directed approval of the application based on the "concepts" set out in the Lincoln Heights Specific Plan portion of the City's Comprehensive Plan. The Council concluded that although the "mixed use" designation was not specifically provided for by the City's zoning ordinances, it "must be categorized by `similarity' to `listed uses' and allowed in the `appropriate zone or by special permit as the case may be.' SMC 11.19.320." CP at 39. The City Council directed approval of the application based on the "concepts" set out in the Lincoln Heights Specific Plan of the Comprehensive Plan.
Pinecrest Homeowners Association, Rockwood Neighborhood Council, Pam Behring, Josh Burrows, John and Diane Scelfo, Tighe and Marybeth Smith, Dale and Carol Ruemping, Brian and Tanya Rekofke, Steve and Marty Schmauch, Andrew Boulet, Barbara McGann, and Del and Maggie Schueneman (Homeowners) then appealed to the superior court. The court concluded, on the strength of RCW 36.70B.040(1),[2] that the City Council had authority to authorize the rezone based upon the Comprehensive Plan.
The Homeowners appeal the decision of the superior court, which affirmed the Spokane City Council's reversal of the hearings examiner's denial of Cloninger's application for rezone.
On remand from the superior court, the hearings examiner approved the rezone in accordance with the City Council's direction. The Homeowners elected not to supersede or enjoin the superior court judgment.

DISCUSSION
FAILURE TO ENJOIN LAND USE PENDING APPEAL
Cloninger has moved to dismiss the appeal as moot. Following the trial court's decision affirming the City Council, the hearings examiner approved Cloninger's application. A building permit was issued, and the project is proceeding. Cloninger argues that this permit is the subject of this appeal. And, since the Homeowners have failed either to supersede the judgment or to enjoin the project, their original appeal from the superior court judgment is moot.
We disagree. The posting of a supersedeas bond is an option, not a requirement: "A petitioner or other party may request the *942 court to stay or suspend an action by the local jurisdiction or another party to implement the decision under review." RCW 36.70C.100(1) (emphasis added).
Cloninger relies on Tri-State Construction Co. v. City of Seattle for the proposition that failure to enjoin this project obviates the opportunity for an appeal. Tri-State Constr. Co. v. City of Seattle, 14 Wash.App. 476, 543 P.2d 353 (1975). Tri-State is not on point, however. In that case, a disgruntled low bidder sued the City of Seattle after the city awarded the contract to another bidder. The contractor did not, however, try to enjoin construction of the project. By the time his suit was heard, the job had been completed. Id. at 476-77, 543 P.2d 353.
Here, not only has the work not been completed, but if the project is not authorized, legally, Cloninger runs the risk of having to dismantle it. Cloninger's exchange of correspondence with the City acknowledges as much: "Cloninger desires to proceed with his development and he understands he is proceeding with the risk that the Appellants may or may not prevail at the Court of Appeals." Letter from Joseph P. Delay to Michael J. Piccolo dated May 21, 2002, attached to Supplemental Declaration of F.J. Dullanty, Jr., dated Nov. 1, 2002.
The appeal here is from a judgment of the superior court affirming a decision of the City Council directing that a rezone be granted. It is not necessary for the Homeowners to appeal the hearings examiner's second decision which complied with the City Council's direction by order of the superior court. The correct decision is before us for review.
REZONE AUTHORITY STANDARD OF REVIEW
The superior court may grant relief from a land use decision if "[t]he land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise." RCW 36.70C.130(1)(b). The Homeowners' argument is that the City erroneously interpreted the law. Our review is then de novo. Ass'n of Rural Residents v. Kitsap County, 95 Wash.App. 383, 390, 974 P.2d 863 (1999), rev'd on other grounds, 141 Wash.2d 185, 4 P.3d 115 (2000).
Actions of the city council, planning commission, or hearings examiner that determine the legal rights of particular parties in a hearing or other contested proceeding are quasi-judicial acts. Raynes v. City of Leavenworth, 118 Wash.2d 237, 247, 821 P.2d 1204 (1992). We therefore review it as such.
COMPREHENSIVE PLANNING VERSUS ZONING
The Homeowners complain that the City Council's decision countenances an arbitrary land use decision. There are no mixed-use land regulations in place and therefore no specific standards. They contend that the Comprehensive Plan here has effectively replaced the zoning codesomething it was never intended to do and for which it is ill suited. Cloninger responds that the Lincoln Heights Specific Plan was sufficiently definite, precise, and clear to structure the decision to rezone.
We begin with the well-accepted notion that planning and zoning are not the same thing. A comprehensive land use plan is "a generalized coordinated land use policy statement of the governing body...." RCW 36.70A.030(4).
Development regulations, on the other hand, are "the controls placed on development or land use activities by a county or city, including, but not limited to, zoning ordinances...." RCW 36.70A.030(7). "The plan embodies policy determinations and guiding principles; the zoning ordinances provide the detailed means of giving effect to those principles." 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING 3D § 1.03, at 9-10 (1986).
Thus, zoning and comprehensive plans perform fundamentally different functions. 1 ANDERSON, supra, § 1.13, at 21 n. 47 (quoting San Diego Gas & Elec. Co. v. City of San Diego, 81 Cal.App.3d 844, 146 Cal. Rptr. 103 (1978)). "`Zoning is very precise and legally restricts the present land use, while the general plan is merely a planning document which is to serve as a guide to future land use.'" 1 ANDERSON, supra, § 1.13, at 21 n. 47 (quoting San Diego Gas & Elec., 146 Cal.Rptr. at 111).
*943 These differences have been accepted in Washington:

Planning, as such, then in effect forms a blueprint for the various regulatory measures it suggests.
Municipal "zoning" on the other hand, is, in effect, a part of and an end result or product of effective municipal "planning," for it is through the medium of enacted and enforceable zoning regulations that the aims and objectives of the land-use-classification facet of over-all municipal "planning" may be carried to fruition.

Shelton v. City of Bellevue, 73 Wash.2d 28, 35, 435 P.2d 949 (1968) (emphasis added).
And, in fact, the City's generalized land use plans anticipate zoning ordinances for guidance in mixed-use development:
Because there are so many aspects of mixed-use development that must be carefully coordinated, all proposals should be evaluated through the City's zoning regulations, utilizing the criteria in the Planned Unit Development section of the regulations. This allows the Zoning Board to vary the specific standards provided in the zoning ordinance, utilizing the various incentives described in the Goals and Policies and to apply these special standards needed for successfully mixing uses.
CP at 213 (emphasis added).
The Homeowners argue that the Lincoln Heights Specific Plan (Comprehensive Plan) merely identified "concepts" that proposals should "demonstrate compliance with"as comprehensive plans do. But the plan contemplated the promulgation of specific mixed-use regulations to implement these policies. We agree.
Use of a generalizedor even an area specificcomprehensive plan leads to the sort of "ad hoc case-by-case policymaking" judicially condemned in Anderson v. City of Issaquah.[3] The idea underlying zoning ordinances is that unrestricted discretion should not be given to the administrative bodies or city officials who are charged with land use planning. And it is for that reason that they must be specific. Indian Trail Prop. Owner's Ass'n v. City of Spokane, 76 Wash.App. 430, 437, 886 P.2d 209 (1994).
In this case, crucial questions are left unanswered. What specifically is "mixed use"? And what are the specific standards for it? These problems were essentially acknowledged by the City Council when it ordered the preparation and implementation of zoning ordinances.
The concepts set out in the Lincoln Heights Specific Plan are just thatconcepts. They are not, nor were they ever intended to be, the specific regulations necessary to give "`effective or meaningful guidance' to applicants, to design professionals, or to the public officials ... who are responsible for enforcing the code." Anderson v. City of Issaquah, 70 Wash.App. 64, 76, 851 P.2d 744 (1993) (quoting Br. of Amicus Curiae).
The City and Cloninger argue, citing RCW 36.70B.040(1),[4] that the statutory scheme here contemplates and anticipates the use of a comprehensive plan for land use decisions "in the absence of applicable development regulations."
But this area is zoned. The problem is that the area is not zoned for mixed use. And therefore, at least for the time being, the proposed development is inconsistent with the current zoning regulations.
The question is whether or not the Comprehensive Plan can be used to evaluate the propriety of a project for a mixed-use development in the absence of appropriate zoning regulations. And our answer is that it cannot.
Land use regulations are unconstitutionally vague if they empower an administrative agency to make discretionary, arbitrary decisions based on standards which are vague, unarticulated, and unpublished. Anderson, 70 Wash.App. at 75, 851 P.2d 744. And that is precisely what is going on here.
The Homeowners rely on Citizens for Mount Vernon v. City of Mount Vernon for the proposition that, in a conflict between zoning regulations and the comprehensive *944 plan, the comprehensive plan must give way. Citizens for Mount Vernon v. City of Mount Vernon, 133 Wash.2d 861, 874, 947 P.2d 1208 (1997). Cloninger and the City argue that there is no conflict here between zoning regulations and the plan. That is logically a valid statement. But it is valid only because there are no zoning regulations at all for mixed-use zoning. And so we return to the question: can the City authorize a zone change to accommodate a mixed-use development in the absence of appropriate zoning ordinances.
A statute or regulation that fails to give fair warning is subject to a challenge for vagueness. State v. Reader's Digest Ass'n, 81 Wash.2d 259, 273, 501 P.2d 290 (1972). "`[A] statute which either forbids or requires the doing of an act in terms so vague that men [and women] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" Anderson, 70 Wash.App. at 75, 851 P.2d 744 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). The purpose of the vagueness doctrine is to limit arbitrary and discretionary enforcement of the law such as that manifested here. Burien Bark Supply v. King County, 106 Wash.2d 868, 871, 725 P.2d 994 (1986).
The land use regulations here permit the City to make decisions which are discretionary, arbitrary, vague, unarticulated, and unpublished. They are, therefore, unenforceable.
The goals set out in the Lincoln Heights Specific Plan are just thatgoals. They are hortatory. But they are not regulations, guidelines, or the kind of specific criteria necessary for land use decisions. They do not provide the necessary certainty to avoid arbitrary land use decisions.

CONCLUSION
We agree with the Homeowners that RCW 36.70C.100(1) creates the option to seek a stay of the superior court action but does not make it mandatory to do so. We interpret RCW 36.70C.100 in the same manner as Title 8 of the Rules on Appeal. The RAP provides a mechanism by which to seek a stay. It does not impose a requirement to do so. RAP 8.1(b)(2); See, e.g. Bach v. Sarich, 74 Wash.2d 575, 581, 445 P.2d 648 (1968); Murphree v. Rawlings, 3 Wash.App. 880, 882, 479 P.2d 139 (1970). The City's motion to dismiss is accordingly denied.
A comprehensive plan, even when specifically addressing the "concepts" for a particular area, does not provide the necessary specific criteria for land use decisions. The idea of mixed-use zoning in the City of Spokane is obviously a desire of the City Council. All that remains to implement that "policy" are specific zoning regulations governing the development and construction of projects of mixed use.
The judgment of the superior court is reversed.
WE CONCUR: KATO, A.C.J. and SCHULTHEIS, J.
NOTES
[1] SMC 11.19.249 provides in part:

"A. Areas designated `high-density residential/low-rise office' in an adopted design plan, which are identified on the zoning map as RO-1D (high-density residential/low-rise office), allow the permitted uses and are subject to the regulations of the RO-1 zone....
"In addition to the RO-1 uses, B1 uses (except service stations, drive-ins, car washing facilities, motels and household appliance rental) may be allowed by special permit from the hearing examiner when located in a mixed-use development where the RO-1 uses are not less than one-half of the building floor area in the total development and when the design is consistent with the policies of the design plan."
[2] "RCW 36.70B.040. Determination of consistency. (1) A proposed project's consistency with a local government's development regulations adopted under chapter 36.70A RCW, or, in the absence of applicable development regulations, the appropriate elements of the comprehensive plan adopted under chapter 36.70A RCW shall be decided by the local government during project review by consideration of:

"(a) The type of land use;
"(b) The level of development, such as units per acre or other measures of density;
"(c) Infrastructure, including public facilities and services needed to serve the development; and
"(d) The characteristics of the development, such as development standards." (Emphasis added.)
[3] 70 Wash.App. 64, 79, 851 P.2d 744 (1993).
[4] See footnote 2.