223 P.3d 1201 (2009)
153 Wash.App. 673
William CONNER and Marilyn Conner, husband and wife, Appellants,
v.
CITY OF SEATTLE, a Washington municipal corporation, Respondent.
No. 62563-2-I.
Court of Appeals of Washington, Division 1.
December 21, 2009.
*1203 George Richard Hill, McCullough Hill, PS, Seattle, WA, for Appellants.
*1204 Judith B. Barbour, Seattle City Attorneys Office, Seattle, WA, for Respondent.
Brian Trevor Hodges, Pacific Legal Foundation, Bellevue, WA, Nicholas Gieseler, Pacific Legal Foundation, Stuart, FL, for Amicus Curiae Pacific Legal Foundation.
Julia Miller, Elizabeth S. Merritt, National Trust for Historic Preservation, Washington, DC, Michael David Smith, Attorney at Law, Baltimore, MD, John Paul Bagley, Attorney at Law, Salt Lake City, UT, for Amicus Curiae The National Trust for Historic Preservation.
ELLINGTON, J.
¶ 1 William and Marilyn Conner purchased a designated historical landmark property in West Seattle known as the Satterlee House. The Landmarks Preservation Board rejected their proposal to develop the site because it did not preserve the protected historic features. The hearing examiner and the superior court upheld the Board's decision.
¶ 2 The Conners' principal contention is that the Landmarks Preservation Ordinance[1] is unconstitutionally vague as applied. They also contend the landmark restrictions on the property constitute an unlawful tax, a regulatory taking, and deprived them of due process. We reject their arguments and affirm.

BACKGROUND
¶ 3 The property at issue here comprises a large house at the top of a gently sloping hill overlooking Puget Sound. The house was built in about 1906. It has three stories, of the style known as the "Seattle classic box." The grounds include a gazebo and other original landscaping features. The site is approximately an acre in size and originally consisted of two lots, bounded on the east by a wooded hillside and on the west by Beach Drive.
¶ 4 Owner David Satterlee contacted the Seattle Historic Preservation Program about having the house and grounds nominated as a historic site, with the hope of securing preservation funding. The property was designated as an historical landmark by the Seattle Landmarks Preservation Board (Board) in 1981. The Board recommended that the city council impose controls on the property such that approval would be required for significant changes or addition of new structures. The city adopted Ordinance 111022 in 1983, imposing those controls.
¶ 5 In 2000, William and Marilyn Conner (hereafter Conner) bought the property. Conner was aware of the historical landmark designation and the requirement for approval by the Board before significant changes are made to the property.
¶ 6 Conner short-platted the west parcel into three lots and proposed to build three contemporary homes, each larger than the landmark house. He sought a certificate of approval for the project.
¶ 7 After a long process of negotiations, the Board ultimately rejected Conner's proposal as inconsistent with the purposes of the landmark designation. Conner appealed to a hearing examiner, who affirmed. Conner challenged the hearing examiner's decision in a land use petition, which the superior court dismissed.

DISCUSSION
¶ 8 Judicial review of land use decisions is governed by the Land Use Petition Act (LUPA), chapter 36.70C RCW. Under LUPA, a court may grant relief only if certain criteria are met.[2] We review the hearing examiner's decision de novo on the administrative record.[3] We review alleged *1205 errors of law de novo.[4]
¶ 9 Conner contends the hearing examiner made a mistake of law, the evidence did not support the decision, the decision was clearly erroneous, and the decision violates his constitutional rights.

LPO ProceduresGenerally
¶ 10 As relevant here, the procedures under the Seattle Landmarks Preservation Ordinance (LPO) are as follows. Any person may nominate a site as a landmark.[5] The Board must approve the nomination at a public meeting.[6] After approving a nomination, the Board must decide whether to approve designation of the site as a landmark. This step also requires a public meeting.[7] If the Board approves designation, it must prepare a written report describing the site, the features or characteristics to be preserved, and the reasons for the designation.[8]
¶ 11 The Board must also request that the owner consult with Board staff to develop and agree upon appropriate controls and incentives to be applied to the landmark.[9] If objections to proposed controls and incentives are timely filed, the LPO sets out detailed procedures for negotiation and appeal.[10] Once controls and incentives are determined, the Board transmits its recommendation to the city council for further action.[11]
¶ 12 The city council may issue a designating ordinance, which includes a legal description of the site, the specific features or characteristics designated for preservation, the basis for the designation, and the specific controls imposed or incentives granted.[12]

LPO Procedures for Satterlee House
¶ 13 After David Satterlee inquired about landmark designation for the property, city staff submitted a nomination form to the Board. The nomination described both the house and grounds, stating that "[l]andscape elements and siting contribute to the period character and significance of the residence."[13] The nomination further stated that in contrast to neighboring properties which "congregate near the road's edge with much less attention to complementary landscaping," the house "is set back deeply from Beach Drive S.W. with a westward orientation overlooking a gently sloping front lawn, an apparently original goldfish and frog pond, and a large monkey puzzle tree, popular during the early 1900's."[14]
¶ 14 The Board considered the proposed designation at a public meeting in August 1981[15] and voted to approve designation of "the entire exterior of the house, as well as the entire site,"[16] based upon two LPO designation criteria:
[The landmark] embodies the distinctive visible characteristics of an architectural style, or period, or of a method of construction....
Because of its prominence of spatial location, contrasts of siting, age, or scale, [the landmark] is an easily identifiable visual feature of its neighborhood or the city and contributes to the distinctive quality or identity of such neighborhood or the city.[17]
The Board's report further explains the basis for the designation:

*1206 The property is in significant contrast to the surrounding, rather crowded (albeit atmospheric) area, with its long "front yard" extending back and up the slope, climaxed by location of the house near the top of the slope. Much of the design of the grounds dates from the building of the house, ca.1906.[18]
The Board recommended controls to ensure preservation of the landmark, specifically, the requirement that a certificate of approval be obtained:
[B]efore the owner may make alterations or significant changes that would affect the identified features of the [l]andmark[, a] Certificate of Approval would be required for proposed changes to the grounds only when those changes would propose alterations to the existing site plan or if new structures were being proposed for the site.[19]
Satterlee received a copy of the recommendation by certified mail.
¶ 15 In February 1983, the city council adopted Ordinance 111022 (Ordinance) designating the property as a landmark. In the fourth "whereas" paragraph, the Ordinance recites that "the Board and the owners of the designated property agreed to controls and incentives."[20]
¶ 16 In section 1, the Ordinance acknowledges the Board's designation of "the Satterlee House more particularly described as: a portion of Tract 18, Spring Hill Villa Tracts" based upon criteria quoted in the report on designation.[21]
¶ 17 Ordinance section 2 imposes as a control the requirement that a certificate of approval be obtained "before the owner may make alterations to the entire exterior of the house, as well as the entire site."[22]
¶ 18 Ordinance section 3 identifies several incentives as "potentially available to the owner,"[23] including the possibility of uses not otherwise allowed in the zoning area, and certain tax benefits and historic preservation grants-in-aid if the property were also entered in the National Register of Historic Places.

Scope of the Landmark Designation
¶ 19 As a threshold question we must identify the property protected by the landmark designation. Conner contends the city council designated only the house, not the entire site. If this is correct, then Conner needs no approval from the Board to develop the western portion of the property.
¶ 20 The usual rules of statutory construction apply to municipal ordinances.[24] Our objective is to determine the council's intent.[25] Where the meaning of an enactment is clear, it must be given effect.[26] "Plain meaning is discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole."[27] Ordinances "`must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'"[28]
*1207 ¶ 21 Conner contends the reference in Ordinance section 1 to "the Satterlee House" supports his argument. But the purpose of that section is to acknowledge the Board's designation and its basis. The Board designated "the entire exterior of the house, as well as the entire site."[29] Further, the landmark nomination form, the report on designation, and the recommendations to the city council all identify the landmark in shorthand fashion as "Satterlee House" or "Satterlee Residence," but describe it as comprising both the house and the entire site. There is no reasonable argument that the Board intended to designate only the house.
¶ 22 Section 1 also contains a legal description ("a portion of Tract 18, Spring Villa Tracts"[30]), which is identical to those found in the landmark nomination form and in the notice of approval of nominationboth of which propose landmarking the entire site as well as the house. Additionally, since portions of Tract 18 were owned by other people, the reasonable construction is that the description refers to that portion of Tract 18 owned by Satterlee.
¶ 23 Finally, the Ordinance imposes controls upon "the entire exterior of the house, as well as the entire site."[31] There is no basis under the LPO for imposing controls on property not designated as a landmark.
¶ 24 Nothing in the Ordinance indicates the city council intended to designate something less than the Board approved. Only one interpretation of the Ordinance gives effect to all its language and does not render any portion meaningless: that the reference in section 1 to "the Satterlee House" is a reference to the entire site proposed for landmark designation.[32]
¶ 25 Conner contends this interpretation ignores the intent of Satterlee, who initiated the landmark process for his own property. Satterlee testified that he intended the designation to encompass only the house, and that he was assured by the city that landmark status would have no effect on his ability to develop the property. Conner cites a letter in which Satterlee inquired about having "our home nominated as a local historical structure."[33]
¶ 26 As indicated above, the hearing examiner discounted Satterlee's testimony as the product of a failing memory. And even if Satterlee were credible and his intent could be relevant to determining interpretation of a legislative enactment, the evidence before the hearing examiner showed that Satterlee personally inquired about obtaining landmark status for both the "house and grounds."[34] In addition, the record is clear that Satterlee understood the entire property had been designated.[35]
¶ 27 The Ordinance clearly designates the entire site as a historic landmark.

Vagueness[36]
¶ 28 Conner next contends the LPO is unconstitutionally vague as applied in this case.[37] We begin with the presumption that *1208 the LPO is constitutional. Conner has the burden of establishing its vagueness.[38]
¶ 29 A statute is void for vagueness if it regulates action in terms so vague that persons "`of common intelligence must necessarily guess at its meaning and differ as to its application.'"[39] "The purpose of the vagueness doctrine is to ensure that citizens receive fair notice as to what conduct is proscribed, and to prevent the law from being arbitrarily enforced."[40] The doctrine "does not require a statute to meet impossible standards of specificity."[41]
¶ 30 Conner contends the LPO provides no objective criteria from which he can predict what development proposal will be approved. He argues the ordinance thus forces Board members to rely on their own subjective opinions to determine whether his proposal complies with the LPO.
¶ 31 Conner's argument rests first on the premise that the LPO itself can and should provide sufficient detail from which an owner can discern exactly what he or she will be able to build upon a landmark site. The purpose and structure of the LPO do not permit such specificity, however, and the constitution does not require it.[42]
¶ 32 The principal purpose of the LPO is "to designate, preserve, protect, enhance and perpetuate those sites, improvements and objects which reflect significant elements of the City's cultural, aesthetic, social, economic, political, architectural, engineering, historic or other heritage."[43] The result of this emphasis on individual "sites, improvements and objects" is a highly varied list of landmarks peppered throughout Seattle. The list includes objects as small as the Seattle, Chief of the Suquamish statue, and as large as the entire Montlake Cut between Lake Washington and Lake Union. It includes individual residences, apartment buildings, department stores, office towers, churches, schools, firehouses and bridges, as well as tugboats, gardens, parks, and breweries.
¶ 33 Because each landmark has unique features and occupies a unique environment, it is impracticable for a single ordinance to set forth development criteria or standards that could apply to every landmark. Rather, because that which may be appropriate adjacent to the Red Hook Ale Brewery may not be suitable next to the Smith Tower, the LPO requires each landmark designation to provide for specific controls and incentives, thus requiring individual consideration of development proposals.
¶ 34 Here, the agreed control was the requirement of a certificate of approval before new structures are added or significant changes are made. In considering an application for a certificate of approval, the LPO requires the Board and hearing examiner to take into account, among other factors, "[t]he extent to which the proposed alteration or significant change would adversely affect the specific features or characteristics specified in the ... designating ordinance."[44] The Board and hearing examiner also apply relevant standards contained in the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings (Standards),[45] including the following:

*1209 New additions, exterior alterations, or related new construction shall not destroy historic materials that characterize the property. The new work shall be differentiated from the old and shall be compatible with the massing, size, scale, and architectural features to protect the historic integrity of the property and its environment.[46]
These are general standards, which gain specificity from application to a particular landmark and a particular proposal.
¶ 35 The features and characteristics to be protected here are the "prominence of spatial location, contrasts of siting, age, or scale," which make the Satterlee House "an easily identifiable visual feature of its neighborhood or the city and contributes to the distinctive quality or identity of such neighborhood or the city."[47] Given this context, the LPO and the Standards adequately convey that a proposal should not overpower the house in size or scale and should preserve a relationship between the house and its grounds that provides "prominence of spatial location." These are objective criteria.
¶ 36 The fact that an ordinance must be applied in context to a given proposal does not render it unconstitutionally vague. In the context of special use permits, for example, county codes routinely entrust a board to apply general standards to particular circumstances. In State ex rel. Standard Mining & Development Corp. v. Auburn,[48] the Supreme Court considered regulations concerning special use permits for gravel pit operations. The mining company contended the regulations were invalid because they contained no standards to guide the city council in formulating the conditions to attach to such permits.[49] The court rejected this argument: "[T]he specification of standards is not always appropriate in administrative actions.... Only rarely will the environmental factors affecting different special use applications be the same. Generally speaking, the conditions imposed must necessarily differ from case to case."[50]
¶ 37 The same approach has been applied in historic preservation cases.[51] In A-S-P Associates v. City of Raleigh,[52] a landowner challenged an ordinance directing the historic commission to evaluate proposals based upon whether the changes "would be incongruous with the historic aspects of the district."[53] The landowner argued that such a vague standard improperly delegated legislative authority *1210 to the commission. The A-S-P court rejected that argument, describing the incongruity standard as a contextual one, that is, "one which derives its meaning from the objectively determinable, interrelated conditions and characteristics of the subject to which the standard is to be applied."[54] So long as the conditions and characteristics of the historic district were sufficient to provide reasonable guidance to the commission, the standard was constitutionally sound.[55]
¶ 38 Similarly here, the standards derive meaning from the unique conditions and characteristics of the subject to which they are applied. There is no constitutional impediment to such regulations.
¶ 39 Conner contends the absence of definite building standards in the LPO condemns him to submitting application after application until, finally, one meets the Board's subjective standards. This is not correct. To prevent just such a scenario, the LPO allows owners to request consideration of a preliminary design relating only to size, massing, scale, and placement.[56] Further, the architectural review committee (ARC) provides "a less formal venue for applicants to discuss with members of the Board various alternatives that they may wish to consider."[57] The ARC gives "support and design ideas" to help the applicant choose a proposal that adequately preserves the landmark's integrity.[58]
¶ 40 In Burien Bark Supply v. King County,[59] the Supreme Court considered a vagueness challenge to a zoning ordinance that allowed "manufacturing and processing in limited degree."[60] The ordinance did not explain what would be deemed "limited," and county officials had on three occasions assured Burien Bark its operation was legal before ultimately issuing a violation notice thereby plainly demonstrating the term was ambiguous.[61] The court held the ordinance unconstitutionally vague, but strongly suggested that a procedure for clarifying application of the code, if utilized, would have led to a different result.[62]
¶ 41 In this case, Conner availed himself of the preliminary design and ARC procedures. He received consistent feedback to the effect that any successful proposal would include structures that were smaller than the Satterlee House, did not visually overpower it, and were situated to one side of the grounds so as to preserve the "sweep" of the view. These clarifications removed any ambiguities in the LPO, and are sufficient to defeat Conner's vagueness claim.
¶ 42 Conner does not assert that this guidance was ambiguous; he simply disregarded it.
¶ 43 These procedures distinguish this case from Anderson v. Issaquah,[63] upon which Conner principally relies. There, the city's building design code directed the development commission to evaluate proposals based upon a host of subjective criteria such as whether fixtures and accessories were "harmonious" and whether projects were sufficiently "interesting."[64] No procedure for clarification existed. Relying solely on its members' subjective opinions, the development commission rejected Anderson's proposal despite his repeated requests for guidance. Noting that the "commissioners' individual concepts were as vague and undefined as those written in the code," we held the code impermissibly vague.[65]
¶ 44 The ambiguities of the Issaquah code gave neither the applicant nor the development *1211 commission itself a basis for determining whether a given proposal met code requirements, and provided no ascertainable criteria by which a court could review the ultimate decision.[66]
¶ 45 Here, however, the LPO and the Ordinance describe specific features to be preserved, and the Board and ARC utilized their expertise[67] in the context of ascertainable, objective criteria. Conner received consistent guidelines for proposals that would both permit development and preserve the landmark.
¶ 46 Anderson is inapposite for another reason. The Issaquah design code was meant to impose a particular aesthetic throughout the city, but its terms were so subjective they were essentially meaningless.[68] In contrast, as explained above, the Seattle LPO does not purport to apply any particular concept throughout the city. Guidelines are tailored to individual landmarks. The code itself provides for this process; it need not provide specific criteria for every individual landmark to survive a vagueness challenge.
¶ 47 Conner's argument, in its essence, is that the LPO is impermissibly vague because it does not tell him exactly what he can do with his property. This is not the test. The question is whether Conner can ascertain the requirements for an acceptable project. The LPO contains both contextual standards and a process for clarification and guidance as to individual sites. From these, a landowner can ascertain what changes may be made. The constitution requires no more.

Conner's Proposal
¶ 48 The hearing examiner concluded that Conner's proposal was inconsistent with the factors set out in the LPO and the Standards:
4. The height, scale and massing of Appellant's proposal would adversely affect the features and characteristics specified for the property in the designating ordinance[69] because it fails to retain the historic relationship of the Satterlee residence to the sweeping front lawn. The proposal would destroy the residence's "prominence of spatial location," and "contrasts of siting, age and scale" that make it an "easily identifiable visual feature of its neighborhood and contributes to the distinctive quality or identity of such neighborhood."
5. Because the Appellant's proposal fails to retain the historic relationship of the Satterlee residence to the site, it was not shown to be "compatible with the massing, size, [and] scale" of the landmark, and it fails to "protect the historic integrity of the property and its environment." Consequently, the Appellant's proposal does not comply with the Secretary's Standard 9.[70]
¶ 49 Conner contends these conclusions are unsupported by substantial evidence.[71] He *1212 argues that because his proposal would leave the house itself untouched, would preserve a view of the house from the street, and would involve new houses "only slightly larger"[72] than the landmark house, there was no basis for the examiner to conclude the landmark would be adversely affected or that his proposal fails to protect the historic integrity of the property.
¶ 50 Conner's arguments first depend on the premise that only the house itself is a protected landmark. We have already explained this is not the case. Second, Conner assumes that a view corridor from the street to the house suffices to preserve the historic integrity of the features and characteristics identified in the Ordinance. Conner provides no evidence or authority for this proposition, which we find unpersuasive. Nothing in the Ordinance suggests the objective of the landmark designation was merely to ensure that the house can be seen from some point on the sidewalk.
¶ 51 More importantly, the record provides substantial support for the hearing examiner's conclusions. Conner proposed to build three contemporary homes, each larger than the Satterlee House and occupying a significant portion of the grounds. Extensive testimony from Board members, one of whom is an architect and architectural historian, described how the proposal would compromise the landmark features. The evidence amply supports the findings.
¶ 52 Conner also challenges the examiner's conclusion of law 20, which states, "The Appellant's proposal is not reasonable in light of the alternatives available that would not adversely affect the landmark and would provide him with a reasonable economic use of the property."[73] Conner argues the conclusion demonstrates that the hearing examiner applied the wrong standard, because SMC 25.12.750(B) directs the examiner to consider "[t]he reasonableness or lack thereof of the proposed alteration or significant change in light of other alternatives available to achieve the objectives of the owner and the applicant."[74] Conner argues the examiner improperly substituted the concept of "reasonable use" for the required consideration of the "objectives of the owner."
¶ 53 Conclusion of law 20 amounts to a summary of the previous seven conclusions, which address each of the required considerations, to wit, that under SMC 25.12.750(A) and Standard 9, the proposal would adversely affect the landmark; under SMC 25.12.750(B), alternatives exist that would achieve the owner's reasonable objectives without causing adverse effects; and under SMC 25.12.580, these alternatives demonstrate that denying Conner's application would not deprive him of reasonable economic use of the property.[75] Conclusion of law 20 is not error.
¶ 54 The examiner addressed SMC 25.12.750(B) at length in conclusion of law 15:
To the extent that the Appellant's objectives are to make a predetermined developer's return on the property, there may be no other alternative development schemes available, although that is not clear from the evidence. Development of a site that was landmarked at the time of purchase undoubtedly requires a degree of flexibility and creativity that has not been shown on this record. In any event, the Board has demonstrated that there are other alternatives available to achieve the reasonable objectives of a person in the Appellant's position as a purchaser of landmarked property subject to agreed controls.[76]
*1213 Although Conner assigns error to this conclusion, he makes no reference to it in the body of his brief, and does not argue that the hearing examiner's interpretation that the owner's objectives must be "reasonable" is incorrect or otherwise improper.[77]
¶ 55 Conner's argument rests upon his insistence that the "owner's objectives" are not subject to review. Conner's identified objective is to "build homes that in his view are marketable, will provide a reasonable rate of return, and are approximately 3,000 square feet in size."[78] The hearing examiner implicitly rejected this objective as unreasonable: "A party who purchases property subject to agreed landmark controls cannot thwart those controls by defining his objectives under SMC 25.12.750(B) entirely in terms of the return he wishes to make on the property."[79] We agree.
¶ 56 The evidence demonstrates there are alternatives that would provide Conner a reasonable return on his investment. The Board presented expert testimony indicating that Conner would still realize between 21.47 and 60.73 percent gross profit (or between 23.9 and 67.30 percent profit on equity) by acting in accord with one of the following scenarios: (1) rent the Satterlee House as a residence, then resell the entire property at current market value; (2) sell the house and its lot and finish and sell the other three lots for future development subject to development restrictions; or (3) sell the house and its lot, secure a certificate of approval, and develop the other three lots with homes that have no adverse effect on the protected features of the landmark.
¶ 57 The hearing examiner's conclusions that Conner's proposal did not satisfy the LPO are supported by substantial evidence.

Application of RCW 82.02.020
¶ 58 RCW 82.02.020 provides in part: "Except as provided in RCW 64.34.440 and 82.02.050 through 82.02.090, no county, city, town or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on ... the development, subdivision, classification, or reclassification of land." A "tax, fee, or charge" can be in kind or in dollars.[80] RCW 82.02.020 thus prohibits ordinances that require developers to set aside land as a condition of development.[81] However, RCW 82.02.020 "does not preclude dedications of land or easements within the proposed development or plat which the county, city, town, or other municipal corporation can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply."[82]
¶ 59 Conner contends the denial of his application imposes an indirect, in kind tax, fee, or charge which is not reasonably necessary as a direct result of the proposal by requiring that any houses be placed as far to the north as possible and be smaller than proposed.
¶ 60 First, the Board imposed no such requirements. The Board denied Conner's application because it did not satisfy the LPO standards. Changing the proposal to make the houses smaller and positioning them farther to the north might have satisfied the standards, but nowhere did the Board or the hearing examiner indicate that such changes were conditions for approval.
¶ 61 Second, had the Board imposed these conditions, we would find them reasonably necessary as a direct result of the proposed development because they are specifically directed to avoiding or mitigating adverse affects on the landmark. "Rough proportionality" for conditions on development has been found wanting where an ordinance operates automaticallyfor example, requiring open space dedications "in a preset amount, regardless of the specific needs created by a *1214 given development," or "a uniform requirement for cleared area on each lot, unrelated to any evaluation of the demonstrated impact of proposed development."[83] Here, there is no such uniform or automatic requirement. RCW 82.02.020 does not apply.

Due Process and Takings
¶ 62 Conner finally contends denial of his application for a certificate of approval constitutes a regulatory taking and deprived him of substantive due process.
¶ 63 The threshold inquiry in a takings analysis is "whether the regulation destroys or derogates any fundamental attribute of property ownership: including the right to possess; to exclude others; or to dispose of property."[84] If there is no such "total taking," the next question is "whether the challenged regulation safeguards the public interest in health, safety, the environment or the fiscal integrity of an area, or whether the regulation `seeks less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit.'"[85]
¶ 64 Conner's argument that a total taking occurred depends entirely on the unsubstantiated premise that the Board "is seeking to impose a view easement on the vacant lots."[86] But there is no evidence that the Board "imposed" anything. Rather, it determined Conner's proposal did not satisfy the requirements of the LPO and accordingly denied his application. There is no indication that the Board requested an easement or that the proposal would have been approved if an easement had been included. Conner thus does not show a total taking destroying a fundamental attribute of property ownership.
¶ 65 The second threshold inquiry is whether the regulation "safeguards the public interest in health, safety, the environment or the fiscal integrity of an area" or instead merely seeks to provide an affirmative public benefit.[87] Conner cites First Covenant Church v. Seattle[88] to argue the regulation cannot serve to prevent a harm because "[p]reservation ordinances further cultural and esthetic interests, but they do not protect public health or safety."[89]
¶ 66 First Covenant Church is inapposite. There, the church challenged the LPO as a violation of the First Amendment right to free exercise of religion.[90] The burden on such a right is justified only if the State demonstrates it has a "compelling interest" in enforcing its enactment.[91] The Supreme Court held that the city's interest in preserving aesthetic and historic structures is not compelling and does not justify infringement of the right to freely exercise religion. "The possible loss of significant architectural elements is a price we must accept to guarantee the paramount right of religious freedom."[92]
¶ 67 A due process takings analysis does not require that government prove a compelling interest. Rather, the relevant question is "whether the challenged regulation safeguards the public interest in ... the environment."[93] Seattle's historical landmarks are features of the urban environment, and the LPO was enacted to protect them "in the interest of the prosperity, civic pride, and general welfare of the people."[94] *1215 In this case, Conner's proposal was rejected in order to safeguard the public's interest in the historic environmental features of a designated landmark.
¶ 68 Since Conner fails to make the requisite threshold showing for a due process taking, further analysis is unnecessary.
¶ 69 Conner also demonstrates no deprivation of substantive due process. To determine whether a regulation violates due process, we evaluate "`(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.'"[95]
¶ 70 As indicated above, landmark preservation is a legitimate state interest, and rejection of Conner's incompatible proposal was "aimed at" achieving that purpose. Conner does not argue that the means used to protect the landmark were unreasonable. Conner's argument that the denial is unduly oppressive rests, again, on the mistaken assumption that it imposes a view easement upon the property. As we have already rejected that premise, the argument fails.
¶ 71 Conner fails to demonstrate grounds for relief. We affirm.
WE CONCUR: COX and BECKER, JJ.
NOTES
[1] Chapter 25.12 Seattle Municipal Code (SMC).
[2] To prevail, Conner must establish one of the following: "(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise; (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court; (d) The land use decision is a clearly erroneous application of the law to the facts; (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or (f) The land use decision violates the constitutional rights of the party seeking relief." RCW 36.70C.130(1).
[3] Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999).
[4] City of University Place v. McGuire, 144 Wash.2d 640, 647, 30 P.3d 453 (2001).
[5] SMC 25.12.370.
[6] SMC 25.12.380.
[7] SMC 25.12.390, .400.
[8] SMC 25.12.430.
[9] SMC 25.12.490.
[10] See SMC 25.12.540-.640.
[11] SMC 25.12.540.
[12] SMC 25.12.660.
[13] Clerk's Papers (CP) at 470.
[14] Id.
[15] The Board approved the nomination in July 1981, and provided Satterlee with notice of the approval.
[16] CP at 925.
[17] Id.
[18] Id.
[19] CP at 360.
[20] CP at 323. Conner contends there was no agreement as to controls, but the only evidence on this point is the recitation to the contrary in the Ordinance. Satterlee testified only that he had nothing in writing concerning development restrictions. But Satterlee had full notice of both the proposed certificate requirement and the language in the Ordinance reciting the existence of an agreement SMC 25.12.540 provides a procedure for objecting to proposed controls; Satterlee lodged no objections. The hearing examiner found Satterlee's testimony to be the product of "a failing memory." CP at 108.
[21] CP at 323.
[22] CP at 324.
[23] Id.
[24] Spokane v. Fischer, 110 Wash.2d 541, 542, 754 P.2d 1241 (1988).
[25] Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 9-10, 43 P.3d 4 (2002).
[26] Id.
[27] Christensen v. Ellsworth, 162 Wash.2d 365, 373, 173 P.3d 228 (2007) (citing id. at 9-12, 43 P.3d 4).
[28] Rapid Settlements, Ltd. v. Symetra Life Ins. Co., 134 Wash.App. 329, 332, 139 P.3d 411 (2006) (quoting Prison Legal News v. State, Dep't of Corr., 154 Wash.2d 628, 644, 115 P.3d 316 (2005)), rev. den., 160 Wash.2d 1015 (2007).
[29] CP at 925.
[30] CP at 323.
[31] CP at 324.
[32] As the hearing examiner points out, it is also significant that the Ordinance capitalizes "Satterlee House" in describing the landmarked property in section 1, but uses lowercase letters when referring to the house in section 2. This distinction suggests the capitalized phrase refers to more than the structure alone.
[33] CP at 352 (emphasis added).
[34] CP at 354.
[35] For example, in 2000, Satterlee conveyed a view easement to Historic Seattle, a nonprofit organization unaffiliated with the Board. The easement recites that the property subject to the easement is a designated landmark and "includes an undeveloped lot between the Building and Beach Drive." CP at 1111.
[36] On this issue the court accepted amicus briefs from Pacific Legal Foundation and the National Trust for Historic Preservation.
[37] In response to a question from this court during oral argument, Conner's counsel indicated he also challenged the Ordinance as unconstitutionally vague. This argument was not made in the briefs, and we don't consider it. RAP 10.3, 12.1.
[38] Haley v. Med. Disciplinary Bd., 117 Wash.2d 720, 739, 818 P.2d 1062 (1991).
[39] Id. (quoting Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322(1926)).
[40] Id. at 739-40, 818 P.2d 1062.
[41] Anderson v. City of Issaquah, 70 Wash.App. 64, 75, 851 P.2d 744 (1993).
[42] Id. ("vagueness test does not require a statute to meet impossible standards of specificity").
[43] SMC 25.12.020(B) (emphasis added).
[44] SMC 25.12.750(A). The LPO also directs the Board or hearing examiner to consider the reasonableness of the proposal in light of alternatives available to achieve the owner's objections; the extent to which the proposed alteration is necessary to meet other legal requirements; educational specifications, if the property is used as a public school facility; and, where a hearing examiner has made a decision on controls and incentives, the extent to which the proposal is necessary or appropriate for the owner to achieve a reasonable return on the site. SMC 25.12.750(B)-(E).
[45] U.S. DEP'T OF INTERIOR, NAT'L PARK SERV., THE SECRETARY OF THE INTERIOR'S STANDARDS FOR REHABILITATION AND GUIDELINES FOR REHABILITATING HISTORIC BUILDINGS (2000), available at http://www.nps.gov/history/hps/TPS/tax/rhb/stand.htm (codified at 36 C.F.R. § 67.7). The Board adopted the Standards in its rules and regulations.
[46] 36 C.F.R. § 67.7(b)(9) (emphasis added).
[47] CP at 323-24.
[48] 82 Wash.2d 321, 510 P.2d 647 (1973).
[49] The mining company argued the regulations constituted an improper delegation of legislative authority. Cases involving delegation issues are instructive here because the delegation and vagueness doctrines are closely related. See Cass R. Sunstein, Nondelegation Canons, 67 U. CHI. L.REV. 315, 320 (2000) (nondelegation and vagueness doctrines closely connected and serve the same purposes). The delegation issue focuses on whether the challenged law provides sufficient standards to guide administrative implementation; the vagueness issue focuses on whether the law provides sufficient standards to provide fair notice to citizens and deter arbitrary enforcement. Id.
[50] Standard Mining, 82 Wash.2d at 330-31, 510 P.2d 647; see also Cingular Wireless, LLC v. Thurston County, 131 Wash.App. 756, 763, 129 P.3d 300 (2006) (rejecting vagueness attack on code section providing that special use permit would be denied unless "`the proposed special use is appropriate in the location for which it is proposed'" and "`shall not result in substantial or undue adverse effects on adjacent property, neighborhood character,'" etc.) (quoting Thurston County Code 20.54.040).
[51] See, e.g., Nadelson v. Township of Millburn, 297 N.J.Super. 549, 688 A.2d 672, 677-78 (1996); U-Haul Co. v. City of St. Louis, 855 S.W.2d 424, 427 (Mo.App.1993) (ordinance entrusting Heritage Commission to enforce exterior appearance standards on a case-by-case basis not unconstitutionally vague where it focused on specific areas, including "architectural development of the community, unattractiveness, compatibility with the neighborhood, and absence of detriment to the neighborhood" because "[i]t would be practically impossible and socially undesirable for the city to list all minimum exterior standards" (internal quotation marks omitted)).
[52] 298 N.C. 207, 258 S.E.2d 444 (1979).
[53] Id. at 446.
[54] Id. at 454.
[55] Id.
[56] SMC 25.12.680(E).
[57] CP at 1771.
[58] Id.
[59] 106 Wash.2d 868, 725 P.2d 994 (1986).
[60] Id. at 869, 725 P.2d 994 (emphasis omitted).
[61] Id. at 871-72, 725 P.2d 994.
[62] Id. at 872-73, 725 P.2d 994 ("This case could have been avoided had either party availed itself of the codified procedure for clarifying ambiguous aspects of the code.").
[63] 70 Wash.App. 64, 851 P.2d 744 (1993).
[64] Id. at 67, 851 P.2d 744.
[65] Id. at 78, 851 P.2d 744.
[66] Id. at 81, 851 P.2d 744.
[67] The LPO requires the Board to be comprised of experts in relevant disciplines, including architecture, history, planning, structural engineering, real estate, and finance. SMC 25.12.270. As many other courts have noted, such a requirement provides additional protection against arbitrary enforcement of the law. See, e.g., Riel v. City of Bradford, 485 F.3d 736, 755 (3rd Cir. 2007); Nadelson, 688 A.2d at 678; Estate of Tippett v. City of Miami, 645 So.2d 533, 537 (Fla.App.1994) (Gersten, J., concurring); U-Haul Co., 855 S.W.2d at 426; A-S-P Assoc., 258 S.E.2d at 454; Maher v. City of New Orleans, 516 F.2d 1051, 1062 (5th Cir.1975).
[68] Anderson, 70 Wash.App. at 77, 851 P.2d 744 ("The `statement' Issaquah is apparently trying to make on its `signature street' is not written in the code. In order to be enforceable, that `statement' must be written down in the code, in understandable terms.").
[69] Unlike the hearing examiner, the Board relied on the features and characteristics described in the report on designation, rather than the Ordinance as the LPO requires. Conner asserts this is "clear error." Any error is irrelevant, however, because we review the hearing examiner's decision, which was properly based upon the Ordinance.
[70] CP at 141.
[71] Conner also contends the examiner made a clear legal error in conclusion of law 4 by failing to make sufficient findings about the characteristics that would be adversely affected and exactly how that would occur. The argument is without merit. The hearing examiner accurately identified the protected features as "the residence's `prominence of spatial location,' and `contrasts of siting, age, and scale.'" CP at 141. She then concluded these features would be "destroy[ed]" because "[t]he height, scale and massing" of the proposal "fails to retain the historic relationship of the Satterlee residence to the sweeping front lawn." Id.
[72] Appellant's Reply Br. at 18.
[73] CP at 143.
[74] SMC 25.12.750(B).
[75] SMC 25.12.580 ("In no event shall ... any proceedings under or application of this chapter deprive any owner of a site, improvement or object of a reasonable economic use of such site, improvement or object.").
[76] CP at 142-43.
[77] CP at 142.
[78] Appellant's Br. at 39.
[79] CP at 142.
[80] Isla Verde Int'l Holdings Inc. v. City of Camas, 146 Wash.2d 740, 758, 49 P.3d 867 (2002).
[81] Id.; Citizens' Alliance for Property Rights (CAPR) v. Sims, 145 Wash.App. 649, 662, 187 P.3d 786 (2008), rev. den., 165 Wash.2d 1030, 203 P.3d 378 (2009).
[82] RCW 82.02.020.
[83] CAPR, 145 Wash.App. at 666, 668, 187 P.3d 786.
[84] Guimont v. Clarke, 121 Wash.2d 586, 602, 854 P.2d 1 (1993).
[85] Id. at 603, 854 P.2d 1 (quoting Robinson v. Seattle, 119 Wash.2d 34, 49, 830 P.2d 318 (1992)).
[86] Appellant's Br. at 42.
[87] Guimont, 121 Wash.2d at 603, 854 P.2d 1.
[88] 120 Wash.2d 203, 840 P.2d 174 (1992).
[89] Id. at 222, 840 P.2d 174.
[90] Id. at 208, 840 P.2d 174.
[91] Id. at 222, 840 P.2d 174.
[92] Id. at 223, 840 P.2d 174.
[93] Guimont, 121 Wash.2d at 603, 854 P.2d 1.
[94] SMC 25.12.020(A): see also Penn Central Transp. Co. v. New York City, 438 U.S. 104, 107-08, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (recognizing historic conservation as an environmental issue).
[95] Guimont, 121 Wash.2d at 609, 854 P.2d 1 (quoting Presbytery of Seattle v. King County, 114 Wash.2d 320, 330, 787 P.2d 907 (1990)).