[No. 73729-1.   En Banc.]
Argued January 15, 2004.      Decided April 15, 2004.

PINECREST HOMEOWNERS ASSOCIATION, ET AL., *Respondents*, v.
GLEN A. CLONINGER & ASSOCIATES, *Petitioner*.

*Joseph P. Delay* (of *Delay, Curran, Thompson, Pontarolo & Walker, P.S.*) and *Michael Connelly, City Attorney*, and *Michael J. Piccolo, Assistant*, for petitioner.

*Stanley M. Schwartz, Stacy A. Bjordahl*, and *F.J. Dullanty, Jr.* (of *Witherspoon, Kelley, Davenport & Toole, P.S.*), for respondents.

OWENS, J. — The Spokane City Council (City Council) determined that the rezone application of developer Glen A. Cloninger & Associates (Cloninger) could be processed prior to the drafting and enactment of a specific zoning ordinance called for in an immediately effective amendment of the Spokane City Comprehensive Plan. The superior court upheld the City Council's land use decision, but the Court of Appeals then reversed it, prompting Cloninger's petition for review. We reverse the Court of Appeals and affirm, as the superior court did, the City Council's decision.

## FACTS

Cloninger owns an eight-acre parcel of property located on the northeast corner of Napa Street and 29th Avenue in the Lincoln Heights area of Spokane. In 1991, the property was rezoned from multifamily to RO-1L (Limited Residential Office, Category I),[1] permitting Cloninger to develop the parcel as an office park. In May 1992, the City Council passed a resolution allowing restaurants in office parks of five acres or more on sites covered by the Lincoln Heights

---

[1] The Spokane Municipal Code (SMC) is found at http://www.spokanecity.org/citycode. "The RO zone is intended to accommodate relatively unobtrusive business and institutional uses of a type and in locations where they blend into medium-density or high-density residential areas." SMC 11.19.120.A. Category I of the RO zone is "designated as 'RO-1'" and is described as "being for the less intensive business uses." SMC 11.19.120.B. "A 'limited' or 'L' zone is any zone to which the City has added conditions intended to limit or govern the use of a particular parcel of land in the public interest." SMC 11.19.03241.

Neighborhood Specific Plan, a part of the Spokane City Comprehensive Plan. Because building a restaurant on the site also required a rezone to RO-L (Limited Residential Office, Category II),[2] Cloninger applied for the rezone, which was granted on April 8, 1993. Cloninger built the restaurant (on the southeast corner of the site) but deferred development of the office park.

In October 1996, Cloninger applied for an amendment to Land Use Policy 6 of the Lincoln Heights Neighborhood Specific Plan to permit office developments of at least five acres to qualify for mixed use development—that is, development that combines residential, office, and retail uses. Cloninger's proposed development involved a lower level of retail with a second level of office space and, above that, multifamily housing. The City Council passed Resolution 98-69 on September 21, 1998, approving the amendment. With the addition of subsection h) and its 14 governing concepts, Land Use Policy 6 was amended to read as follows:

POLICY 6: Allow low-rise office use along 29th Avenue, as designated on the Land Use Plan Map, subject to the following criteria:

a) Developments should extend generally no more than one block in depth from 29th Avenue.

b) The minimum site area for office development should be two acres.

c) Building height should be limited to 30 feet.

d) Access to developments should be from existing curb cuts on 29th Avenue, not from streets serving residential areas.

e) If a site is not separated from a single family residential area by a street, then increased building and parking setbacks and landscaping should be provided.

f) Rezone proposals should be processed under the P.U.D. [planned unit development] provisions of the zoning code.

---

[2] Category II of the RO zone, "designated 'RO,'" is "less restrictive" than Category I. SMC 11.19.120.B.

g)    Restaurants are allowed in areas designated MDR/O [medium density residential office] on the Land Use Plan map, providing that restaurants be developed in conjunction with P.U.D. of five acres or more.

h)    Allow large developments (five acres or more) to qualify for the "Design" zone designation in accordance with the provisions of SMC 11.19.2405.A, which allows mixed use developments that include specific land uses. Proposals that qualify for the mixed use designation and incorporate mixed uses in a comprehensive site development should demonstrate compliance with the following concepts:

1.    To enable development of integrated, mixed use communities, containing a variety of housing types arranged around an activity center (neighborhood, district, corridor); that provide a pleasant living, shopping, and working environment; that provide a sense of community; and that provide a balance of compatible retail, office, residential, recreational and public uses.

2.    To enable a land use pattern that will reduce dependence on automobile use, especially drive-alone vehicle use during morning and evening commute hours.

3.    To enable the design of new development in a manner that will ensure the safe and efficient movement of goods and people.

4.    To provide direct, convenient pedestrian, bicycle and vehicular access between residences and nearby activity centers, in order to facilitate pedestrian and bicycle travel and reduce the number and length of automobile trips.

5.    To discourage automobile dominated businesses, which are characterized by drive-in and drive-through facilities that allow people to remain in their vehicles while receiving products or services, and uses that traditionally require large amounts of off-street parking.

6.    To provide sufficient housing density to enable cost-effective extension of utilities, services, and streets; facilitate frequent transit service; and to help sustain neighborhood businesses.

7.    To enable many of the community's residents to live within one-fourth (1/4) mile of a grocery store and transit stop.

8. To ensure that activity centers are arranged, scaled and designed to be compatible with surrounding land uses and provide transitions between significantly different land uses (e.g. commercial and residential uses).

9. To ensure that buildings and other development components are arranged, designed and oriented to facilitate pedestrian access and access for transit.

10. To allow innovative site and building designs while providing for design harmony and continuity (e.g., coordinated architectural styles, street trees, lighting, signage and benches).

11. To ensure adequate light, air, privacy and readily accessible open space for each dwelling unit in order to maintain public health, safety and welfare.

12. To provide for appropriately located community open spaces for informal social activity, recreation and aesthetic enhancement of the development.

13. To provide mixed use development with a character that is less physically and visually intrusive than traditional commercial centers, districts and strips.

14. To insure the mixed use development does not undermine the buffer concept described in subsection "e" of this policy.

Certified Record (CR) § IX, at 260-62. Specifically *deleted* from the draft of Resolution 98-69 was a paragraph stating that the resolution would "not take effect until the effective date of the ordinance that creates the zoning category referenced herein (new SMC 11.19.2405) and the effective date of the ordinance/resolution that establishes the design review criteria for use by the Design Review Committee in reviewing mixed use development proposals." CR § IX, at 262. The purpose of the deletion was to enable "the resolution [to] take effect upon adoption." CR § IX, at 311.

Cloninger wrote letters to the city in February and March 2000. John Mercer, director of the city planning services, responded on May 1, 2000. Mercer's letter summarized the process that had culminated in the passage of Resolution 98-69. He acknowledged that Cloninger's "project site [was]

designated Medium Density Residential/Office on the Lincoln Heights Neighborhood Specific Plan." CR § IX, at 6. He surmised that the City Council decision to make Resolution 98-69 immediately effective (prior to the adoption of new zoning and design guidelines) showed that the City Council's "intent was to allow the use of the existing 'Design' zone which most closely fits the adopted policies," and he stated that, "[i]n this case RO-1D provides for mixed use development."[3] In closing, Mercer gave Cloninger three options. The second and third options were for Cloninger to develop his property under its current zoning or to wait for the completion of the new comprehensive plan and development regulations; his first option, however, was as follows: "Apply for a rezone of your property to the RO-1D zone. This may also necessitate a request on your part for a revision of your approved PUD as well as application for Special Permits for the B-1 uses you choose to include pursuant [to] the provisions of SMC 11.19.249." *Id.* Mercer reminded Cloninger that his rezone application would be reviewed by a hearing examiner who would "consider the policies of the existing Comprehensive Plan and Lincoln Height[s] Neighborhood [Specific] Plan (not just amended Land Use Policy 6), other state and city regulations, and relevant information received through the public hearing process." *Id.* In a June 23, 2000, letter to an attorney requesting information on the Cloninger project, Mercer reaffirmed that first option: "While mixed use regulations have yet to be adopted, a property owner may still submit an application for a rezone under existing zoning regulations for design districts under SMC 11.19.241-11.19.2496." CR § IX, at 302.

---

[3] CR § IX, at 6. SMC 11.19.249 provides, in part, as follows:

A. Areas designated "high-density residential/low-rise office" in an adopted design plan . . . allow the permitted uses and are subject to the regulations of the RO-1 zone . . . .

In addition to the RO-1 uses, B1 uses (except service stations, drive-ins, car washing facilities, motels and household appliance rental) may be allowed by special permit from the hearing examiner when located in a mixed-use development where the RO-1 uses are not less than one-half of the building floor area in the total development and when the design is consistent with the policies of the design plan.

Electing the first option, Cloninger applied for a rezone from RO-L to RO-1D, a revision of his existing PUD, and a special permit to allow B1 uses per SMC 11.19.249. On July 26, 2000, the city design review committee voted 7-0 with one abstention to recommend approval of the PUD amendment and special permit, subject to Cloninger's "more fully addressing" concepts 4, 9, 11, and 12 listed in the Lincoln Heights Neighborhood Specific Plan, Land Use Policy 6: h). CR § IX, at 148.

On October 31 and November 2, 2000, the city hearing examiner conducted a public hearing on Cloninger's application. One day before the hearing, the planning department gave Cloninger its staff report, recommending that the application be denied. To permit additional comments, the hearing examiner left the record open until November 29, 2000. On December 11, 2000, the hearing examiner denied the application "subject to the development of appropriate zoning regulations and design review criteria." CR § IX, at 12-28. On January 16, 2001, the hearing examiner denied Cloninger's request for reconsideration. Cloninger appealed the decision to the City Council, and on March 26, 2001, the City Council held a hearing on the appeal.

On April 2, 2001, the City Council reversed and remanded the hearing examiner's decision. The City Council instructed the hearing examiner to process the application "in such a way as to accomplish permitting of the mixed-use land use as a rezone to RO-1D and . . . to do so with reference to the provisions of the Lincoln Heights [Neighborhood] Specific Plan as amended by Resolution No. 98-69." CR § VII, at 9.

On April 20, 2001, the Pinecrest Homeowners Association, the Rockwood Neighborhood Council, and various homeowners (hereafter "Pinecrest") filed a petition in Spokane County Superior Court under the Land Use Petition Act (LUPA), chapter 36.70C RCW, seeking reversal of the City Council decision. Clerk's Papers (CP) at 3-12. On November 14, 2001, Spokane County Superior Court Judge

Michael E. Donohue affirmed the City Council decision "in all respects." CP at 158-59.

Pinecrest appealed the superior court's decision without seeking to supersede or enjoin it. The hearing examiner approved the rezone to RO-1D on August 9, 2002, and Cloninger was thereafter issued a building permit for the parking lot. On February 13, 2003, Division Three of the Court of Appeals reversed the superior court's decision. *Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs.*, 115 Wn. App. 611, 62 P.3d 938 (2003).

We granted Cloninger's petition for review. The parties filed supplemental briefs. The city, which had been a respondent with Cloninger before the Court of Appeals, submitted a supplemental brief in support of Cloninger's petition for review.

## ISSUES

(1) Did Pinecrest's failure to supersede the superior court's judgment moot its appeal of that decision?

(2) Has Pinecrest shown that the City Council misinterpreted the Spokane Municipal Code (SMC) when it allowed Cloninger's land use application to be processed under the similar design zone designation of RO-1D and in accordance with the immediately effective amendment of the Lincoln Heights Neighborhood Specific Plan?

(3) Is the prevailing party entitled to attorney fees?

## ANALYSIS

■ *Mootness.* Cloninger argued to the Court of Appeals that Pinecrest's failure to supersede the superior court's judgment rendered Pinecrest's further appeals moot. The Court of Appeals correctly concluded that RCW 36.70C.100 did not require Pinecrest to request a stay. The statute provides in part that "[a] petitioner or other party *may* request the court to stay or suspend an action by the local jurisdiction or another party to implement the decision

under review." RCW 36.70C.100(1) (emphasis added). While Pinecrest's failure to seek a stay did not compromise its right to appeal the superior court decision, the failure permitted Cloninger to act on the superior court decision; the hearing examiner's subsequent approval of the rezone and the city's granting of a building permit were thus legal actions.

■■ *Standard of Review under LUPA.* Under LUPA, this court stands in the shoes of the superior court and limits its review to the record before the City Council. *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 751, 49 P.3d 867 (2002); RCW 36.70C.120. As the party seeking relief from the land use decision, Pinecrest bears the burden of meeting one of the six standards for granting relief set forth in RCW 36.70C.130(1). *Id.* In its LUPA petition, Pinecrest claimed that the City Council decision was "an erroneous interpretation of the law," was "not supported by substantial evidence," and was "a clearly erroneous application of the law to the facts." CP at 12. Although Pinecrest did not cite RCW 36.70C.130(1)(b)-(d), its assertions of error quote those LUPA standards virtually verbatim. Because the Court of Appeals reversed the superior court and granted Pinecrest's LUPA petition, Cloninger was necessarily the petitioner before this court; however, that status neither eliminates nor alters Pinecrest's burden under RCW 36.70C.130(1).

*The City Council Decision.* The City Council made two main arguments in its written decision. First, the City Council determined that Cloninger's application for a zone change from RO-L to RO-1D (undertaken upon the advice of the director of planning services) could have been processed as a special permit, as provided in SMC 11.19.320: "Whenever a proposed use is not specifically listed in this chapter [SMC 11.19 Zoning Code], the hearing examiner categorizes it by its similarity to listed uses and allows it in the appropriate zone or by special permit as the case may be." While Resolution 98-69 permitted "large developments (five acres or more) to qualify for the 'Design' zone designation in

accordance with the provisions of SMC 11.19.2405.A, which allows mixed use developments," that section of the zoning code was yet to be drafted. CR § IX, at 260. The absence of SMC 11.19.2405.A led the director of planning services to suggest that Cloninger seek approval under the similar design zone designation of RO-1D, described in SMC 11.19.249. In the City Council's analysis, because "the use—mixed-use—[was] 'not specifically listed' in the code," it had to be "categorized by 'similarity' to 'listed uses' and allowed in the 'appropriate zone or by special permit as the case may be.' SMC 11.19.320." CR § VII, at 4. The City Council asserted that use of the SMC 11.19.320 process was mandatory, not discretionary, and that "[r]egulations and design criteria which might come into existence in the future do not act as conditions precedent to the processing of land use applications under SMC 11.19.320." CR § VII, at 5-6. The City Council observed that the hearing examiner "could have, and perhaps should have, processed the permit as a special permit," and it noted, in particular, that "the planned unit development process is a special permit process which is utilized quite often." *Id.* (citing and quoting SMC 11.19.362).

As a second reason warranting the hearing examiner's action upon Cloninger's application, the City Council asserted that Resolution 98-69, which amended the Lincoln Heights Neighborhood Specific Plan and changed the land use map to designate the area subject to the amendment, "required the Hearing Examiner to process a rezone which would accomplish the fulfillment of the purposes of the amended plan." CR § VII, at 6. The City Council underscored that, when it deleted from the draft of Resolution 98-69 a paragraph deferring the resolution's effective date, the City Council had clearly expressed its intention to make the amended specific plan immediately effective, not contingent on the later enactment of the new zoning category and design review criteria. The City Council reasoned further that, because specific plans " 'amend and become part of the comprehensive plan' " and because "land use

codes 'shall be consistent with and implement the comprehensive plan,' " the city's zoning code had to "be consistent with and implement" Resolution 98-69's amendment of the Lincoln Heights Neighborhood Specific Plan. CR § VII, at 8-9 (quoting SMC 11.20.010 and .020, respectively). The City Council thus concluded that Cloninger's site "ha[d] been zoned for mixed-use." CR § VII, at 9.

Accordingly, the City Council's order directed the hearing examiner to process Cloninger's application as a rezone to RO-1D (allowing mixed use), as a special permit, or as a PUD (together with a rezone and special permit), "but in any case to do so with reference to . . . Resolution No. 98-69 to ensure that the mixed-use proposed by the applicant demonstrates compliance with the concepts set forth in the Lincoln Heights Neighborhood Specific Plan, Policy 6, h), 1 through 14 inclusive, and the Land Use Map (of the Specific Plan) to which such Policy applies." *Id.*

■ *Pinecrest's Request for Relief under LUPA.* In its briefing to this court, Pinecrest did not mention the LUPA review standards of RCW 36.70C.130(1), nor did Pinecrest address the applicability of SMC 11.19.320, a linchpin of the City Council decision. Pinecrest's arguments appear to be directed at bolstering the Court of Appeals decision, which rested on RCW 36.70C.130(1)(b). *See Pinecrest*, 115 Wn. App. at 620 (provision requires Pinecrest to show that the City Council " 'decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise' "). This court's review of any claimed error of law in the City Council's interpretation of city ordinances is de novo and must accord deference to the City Council's expertise. *Isla Verde*, 146 Wn.2d at 751; RCW 36.70C.130(1)(b).

Pinecrest advanced no persuasive arguments that the City Council decision was based on an erroneous interpretation of its municipal code or Washington case law. First, Pinecrest contends that, because "[t]he RO-1D zone is permitted in areas designated 'High Density Residential/ Low-Rise Office' on the adopted Comprehensive Plan" and

because "Cloninger's property is designated Medium Density Residential/Office," the RO-1D zone cannot be used to process Cloninger's application. Answer to Pet. for Review at 15. While it is true that the RO-1D zone permits mixed use at higher densities, Pinecrest does not explain why, under SMC 11.19.320, "Uses Not Mentioned," the hearing examiner was not obliged to categorize Cloninger's project by its similarity to the RO-1D zone and then limit the rezone by special permit to medium density. *See* Pet. for Review at 16.

Second, Pinecrest turned to Washington case law to attack the City Council's view that, pending the drafting and enactment of the newly prescribed mixed use zoning ordinances, the Lincoln Heights Neighborhood Specific Plan could serve as a basis for considering Cloninger's rezone application. Pinecrest argued that this court has "rejected the argument that a Comprehensive Plan [of which the Lincoln Heights [Neighborhood] Specific Plan is an element] can be used to make specific land use decisions." Answer to Pet. for Review at 6-7 (citing *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 873, 947 P.2d 1208 (1997)). But Pinecrest has extracted an overly broad holding from *Mount Vernon*. There, the court was asked to review a Mount Vernon City Council decision permitting a commercial PUD in an area zoned R-2A. The court concluded that "[b]y its own terms the zoning code explicitly prohibit[ed] the commercial planned unit development proposed . . . on a site zoned R-2A." *Mount Vernon*, 133 Wn.2d at 872. The zoning code expressly forbade what the developer contended the subsequently enacted comprehensive plan allowed. Resolving the conflict between the prior regulations and the comprehensive plan in favor of "the more specific regulations," this court held that, "when underlying zoning regulations explicitly prohibit a commercial PUD, but the comprehensive plan allows the development, the zoning regulations must govern the land use decision." *Id.* at 873-74. *Mount Vernon* is distinguishable from the present case because there are no prior Spokane

zoning ordinances that explicitly prohibit a medium density mixed use project on Cloninger's site. Rather, as the Spokane planning director and City Council determined, SMC 11.19.320 allowed processing of the rezone application by reference to the similar RO-1D zoning category, which allowed high density mixed use. *See* SMC 11.19.249. Moreover, in the present case, the circumstance is not a conflict between an existing explicit zoning restriction and the city's comprehensive plan; instead, the problem is a time lag between an immediately effective, targeted amendment of the plan and the drafting and enactment of the zoning ordinance referenced in that amendment.

Pinecrest also maintains that *Anderson v. City of Issaquah*, 70 Wn. App. 64, 851 P.2d 744 (1993), supports its contention that the adoption of mixed use regulations must precede any action on Cloninger's rezone application. At issue in *Anderson* was a section of the Issaquah Municipal Code setting forth the aesthetic standards governing building design. The criteria amounted to little more than the general requirement that buildings—in their colors, components, materials, and proportions—must be harmonious with the natural environment and neighboring structures. The *Anderson* decision chronicled the repeated efforts of one developer to intuit and satisfy the shifting personal demands of members of the development commission. (The developer was told, for example, to drive up and down Gilman Boulevard to look for good and bad building facades, and one commissioner actually read into the meeting minutes his own notes, entitled " *'My General Observation From Driving Up and Down Gilman Boulevard.'* " *Id.* at 70.) Pinecrest likens the 14 design concepts in the amended Lincoln Heights Neighborhood Specific Plan to the Issaquah ordinance's statement of aesthetic standards; in Pinecrest's view, the amended plan is too vague to guide the city's consideration of Cloninger's rezone request. But that comparison is not convincing. The aesthetic standards in *Anderson* were much more general than the design criteria at issue here. Also, the 14 concepts in paragraph h) are

considered along with the requirements set forth in the seven preceding paragraphs in Land Use Policy 6. Additionally, whereas in *Anderson* it was the ordinance itself that suffered from excessive vagueness, in the present case Pinecrest has not claimed that the RO-1D zoning ordinance was too vague to serve as the basis for Cloninger's rezone application. While the ordinance in *Anderson* set up an extremely vague building review process, the City Council decision in the present case authorized a process that relied on a sufficiently detailed zoning ordinance (SMC 11.19.249) in concert with a considerable number of design review concepts (in Land Use Policy 6, as amended by Resolution 98-69).

Because Pinecrest has not shown that the City Council misinterpreted provisions of the SMC or violated prior Washington case law, it has not met its burden under LUPA of showing that the City Council decision constituted an "erroneous interpretation of the law." RCW 36.70C.130(1)(b).

■ *Attorney Fees.* Cloninger claims entitlement to attorney fees under RAP 18.1 and RCW 4.84.370. Cloninger complied with RAP 18.1(b) by devoting a section of its petition for review and supplemental brief to its attorney fee request. However, Cloninger's unfavorable result in the Court of Appeals precludes an attorney fee award, for RCW 4.84.370 permits an attorney fee award only if "[t]he prevailing party on appeal was the prevailing or substantially prevailing party before the . . . city . . . *and . . . in all prior judicial proceedings.*" RCW 4.84.370(1)(a)-(b) (emphasis added).

## CONCLUSION

We conclude that Pinecrest has not met its burden under RCW 36.70C.130(1)(b) of showing that the City Council decision was an erroneous interpretation of the law. Consequently, pursuant to RCW 36.70C.140, we affirm the land use decision of the City Council, thereby reversing the

Court of Appeals and upholding the decision of the superior court. The City Council decision properly remanded Cloninger's application to the hearing examiner for processing. Cloninger's request for attorney fees under RCW 4.84.370 is denied.

ALEXANDER, C.J., and JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, CHAMBERS, and FAIRHURST, JJ., concur.

Reconsideration denied June 1, 2004