[No. 39861-3-II.   Division Two.   May 3, 2011.]

REBECCA JULIAN ET AL., *Appellants*, v. THE CITY OF VANCOUVER ET AL., *Respondents*.

*David S. Mann* (of *Gendler & Mann LLP*), for appellants.

*Ted H. Gathe, City Attorney*, and *Linda A. Marousek, Assistant*; and *Steve C. Morasch* (of *Schwabe Williamson & Wyatt*), for respondents.

¶1 VAN DEREN, J. — The city of Vancouver granted conditional approval of Wayne and Delores Monroe's preliminary short plat application that sought to subdivide their parcel into four lots. Neighbors Rebecca Julian and Gretchen Brooks appealed, and a hearing examiner denied the appeal, affirming the city of Vancouver (City) planning official's decision with additional conditions. Julian and Brooks (hereafter Julian) filed a Land Use Petition Act (LUPA), chapter 36.70C RCW, petition in superior court, and the superior court affirmed the hearing examiner's decision. Julian now seeks review, alleging that the hearing examiner did not properly apply the "completely functionally isolated" test contained in a subsection of the City's municipal code, Vancouver Municipal Code (VMC) 20.740.110.[1] We affirm.

[1] As explained below, we determine that former VMC 20.740.110 (2007) applies. That ordinance states in relevant part:

A. Designation

1. . . . There are established in the city the following identified Fish and Wildlife Habitat Conservation Areas:

. . . .

e. Riparian Management Areas [(RMA)] and Riparian Buffers [(RB)]. The regulated areas include the land from the ordinary high water mark to a specified distance as measured horizontally in each direction. The [RMA] is adjacent to the lake, stream or river, and the [RB] is adjacent to the [RMA].

(1) The [RMA] and [RB] are as follows:

. . . .

(A) When impervious surfaces from previous development completely functionally isolate the [RMA] or the [RB] from the waterbody, the regulated riparian area shall extend from the ordinary high water mark to the impervious surfaces. If the waterbody is not completely physically isolated, but is

## FACTS

¶2 The facts relevant to the present stage of this LUPA appeal are as follows. On January 15, 2008, the Monroes filed a proposed short plat with the City called "Garden Creek," which would divide a nearly one acre (0.96 acre) lot in a low density residential zone into four smaller lots and ultimately result in the demolition of the existing single family residence. Administrative Record (AR) § 1, at 1. A watercourse/drainage channel of disputed origin and habitat value runs through the existing lot. The watercourse has been manipulated as a landscaping feature; it runs mostly through underground culverts on the property and through some open areas that are mostly lined with various impervious surfaces. Before filing the short plat application, the Monroes engaged in extensive discussions with the City through preapplication conference procedures in 2005, 2006, and 2007 to determine what was needed to facilitate the lot development.[2]

¶3 Also, the Monroes applied for and obtained a permit to move the watercourse to a different location on the lot to facilitate development before filing the short plat application. The Washington Department of Fish and Wildlife granted the hydraulic project approval permit on January 2, 2006. That permit was not appealed within 30 days thereafter and became a final department action. Thereafter, the City determined that the entire watercourse was functionally isolated in terms of fish and wildlife habitat value. On April 1, 2008, the City granted preliminary approval to the proposed short plat, subject to several specific conditions.

---

completely functionally isolated, the Planning Official may adjust the regulated riparian area to reflect site conditions and sound science.

Former VMC 20.740.110 (2007) (underline omitted) (figure and table omitted).

[2] Each preapplication conference report expressly stated that "Type I, II [short plat] and III applications . . . shall be considered under the subdivision, zoning, and other land development codes in effect at the time a fully completed application is filed." AR § 4, Ex. 34, at 23; AR § 4, Ex. 37, at 26; AR § 4, Ex. 35, at 26.

¶4 Julian opposed the Monroes' proposed short plat. Julian filed an administrative appeal challenging the City's determination, arguing in part that the project failed to meet certain requirements of the City's development code, particularly that "the exemption of the entire site from the Riparian Habitat Ordinance under the 'functionally isolated' standards of [former] VMC 20.740[.110 (2007)] is improper." AR § 2, at 2. Julian primarily argues that the hearing examiner misapplied former VMC 20.740.110 (2007) in that the examiner should have applied the 2005 version of that provision.

¶5 After extensive hearing and argument, the hearing examiner determined that the proposed short plat should be approved under the City's development code, subject to certain modified conditions imposed by the hearing examiner. The hearing examiner's rulings concerning riparian management area (RMA) and riparian buffer (RB) requirements to protect the watercourse are at issue here. They are:

5. The examiner finds that the proposed development is consistent with [former] VMC 20.740.110.[(A)](1)(e) [(2007)]. This section provides:

[RMA] and [RB]. The regulated areas include the land from the ordinary high water mark to a specified distance as measured horizontally in each direction. The [RMA] is adjacent to the lake, stream or river, and the [RB] is adjacent to the [RMA].

(A) When impervious surfaces from previous development completely functionally isolate the [RMA] or the [RB] from the waterbody, the regulated riparian area shall extend from the ordinary high water mark to the impervious surfaces. If the waterbody is not completely physically isolated, but is completely functionally isolated, the Planning Official may adjust the regulated riparian area to reflect site conditions and sound science.

a. The examiner finds that the majority of the watercourse on the site is completely functionally isolated from the adjacent [RMA] and [RB] areas by existing impervious surfaces; pave-

ment, culverts, gravel, plastic lining of the watercourse, etc. See Exhibits 4 and 38. As noted at p 1 of Exhibit 4, of the approximately 256 feet of watercourse on the site, 178 feet is "confined by culverts [or] otherwise impounded by an impervious layer[.]" These impervious areas extend to, and in the case of culverts and the plastic lined channel, beyond, the banks of the watercourse. These impervious areas separate the watercourse from the abutting riparian areas. There is no land area between the ordinary high water mark of the watercourse and these impervious surfaces. Therefore these portions of the on-site watercourse comply with the first section of this provision and a [RMA] is not required.

. . . .

b. As noted in Exhibit 4, the remaining 78 feet of "open" watercourse on the site occurs in three discrete sections; between the north boundary of the site and the northernmost culvert, between the south end of the culvert and the parking area abutting the shop and house, and in the portion of the area between the southern driveway and Lieser Point Road where the watercourse is not lined with culverts, plastic, concrete or other "armoring." See Exhibit 38. The examiner finds that these portions of the watercourse are not physically isolated from the adjacent [RMA] and [RB] by existing impervious areas. Therefore these sections of the watercourse do not comply with the first part of [former] VMC 20.740.110.[(A)](1)(e) [(2007)].

. . . .

c. The examiner finds that the riparian area abutting the section of the watercourse between the northernmost culvert and the north boundary of the site is not "completely functionally isolated." Based on the photographs in the record, this segment of the watercourse and associated riparian area extend onto the adjacent property to the north for quite some distance. See Exhibit 38 and the photos attached to Exhibit[ ] 18 and Attachment 1 of Exhibit 29. This contiguous riparian area appears large enough to allow the interaction and mutual influence between the watercourse and the riparian area that the [RMA] and [RB] are intended to protect. There is evidence of "rock armoring" along a portion of the on-site section of this watercourse segment. See Attachment 3 of Exhibit 28. However there is no substantial evidence that these piles of rock constitute an "impervious surface" sufficient to isolate the watercourse from the abutting riparian area. Therefore the

applicants should be required to modify the preliminary plat to provide a 100-foot [RMA] and a 50-foot buffer adjacent to the segment of the watercourse between the northern end of the northern culvert and the north boundary of the site. Given the location of this segment of the watercourse, it appears feasible to retain the current layout of the development. The applicants need only reduce the size of the building footprints on Lots 1 and 2 to accommodate the [RMA] and [RB] areas.

. . . .

d. The examiner further finds that the remaining two sections of the watercourse on the site that are not physically isolated by impervious surfaces from the adjacent [RMA] and [RB], are completely functionally isolated. These areas may serve some limited riparian function, because the lack of abutting impervious surfaces allows contact, interaction and mutual influence between the watercourse and the adjacent riparian area. However these riparian areas are relatively small. The northern section, between the northern culvert and the driveway abutting the shop, is roughly 30 feet long. The southern section is much shorter. These small riparian areas are physically isolated from upstream and downstream riparian areas by existing culverts and other impervious surfaces. See Exhibit 38. In addition, "the entire length of the watercourse traversing the Monroe property has structurally altered banks which impede the area's ability to form and maintain proper fish and wildlife habitat." P 2 of Ex 4. See also Attachment 3 of Exhibit 28, which illustrates the constraints on the site. Given the small size and physical isolation of these riparian areas and based on the multiple environmental analyses in the record, the examiner finds that the applicants demonstrated that these areas are completely functionally isolated and a[n] [RMA] and [RB] should not be required consistent with sound science. The appellants failed to sustain their burden of proof to the contrary.

Clerk's Papers (CP) at 40-44.

¶6 The Monroes did not appeal the hearing examiner's modified conditions of approval. Julian appealed the ap-

proval under LUPA. On September 2, 2009, the superior court denied the LUPA petition.[3] Julian appeals.[4]

## ANALYSIS

¶7 In the present appeal, Julian renews only a single challenge, asserting that the hearing examiner misapplied the "completely functionally isolated" test contained in a subsection of former VMC 20.740.110 (2007).[5] We disagree.

---

[3] The superior court resolved the scope of the LUPA petition in a separate order that has not been appealed. In his final order, the hearing examiner decided Julian's asserted challenges under the State Environmental Policy Act (SEPA), chapter 43.21C RCW, and many other issues that Julian raised. But the hearing examiner also determined that except for the SEPA challenges, all of Julian's other issues were not timely because they were not raised during the comment period. Nevertheless, the hearing examiner addressed and decided each of Julian's contentions (as dicta) in the event that his determination of untimeliness was reversed on appeal. After Julian filed her LUPA petition, the Monroes moved to dismiss all non-SEPA issues. The superior court denied this preliminary motion on March 4, 2009, ruling that the hearing examiner committed plain error in determining that petitioners had to first raise all of their issues during the comment period rather than during the appeal hearing before the hearing examiner. Subsequently, on April 24, 2009, the superior court entered an agreed order reflecting the parties' stipulation that the LUPA petition would address the non-SEPA matters in the hearing examiner's final order. The court's March 4 and April 24, 2009, orders have not been appealed. Following a June 19, 2009, hearing, the superior court denied the LUPA petition in a September 2, 2009, memorandum opinion and order that resulted in the present appeal.

[4] These facts properly frame the only remaining issues in this case. Julian withdrew her substantive SEPA challenge before oral argument at the trial court. The trial court ruled that the hearing examiner properly disposed of Julian's procedural SEPA challenge and affirmed the final land use decision. Although Julian timely appealed the trial court's September 2, 2009, order denying her LUPA appeal, her briefing to this court argues only that the hearing examiner misapplied a subsection of former VMC 20.740.110 (2007). Thus, she has abandoned all other challenges.

[5] Although Julian's opening brief lists multiple "issues," her substantive arguments reduce to a single issue concerning the proper application of the noted ordinance. Julian also spends much of her opening brief arguing "issues" that are not disputed. (Julian acknowledges that several of her subissues either are not controverted or are no longer issues). For instance, Julian argues that the hearing examiner "properly overruled" the City's use of the "completely functionally isolated exception" and "required a proper [critical areas ordinance] buffer" on the northern open portion of the drainage course. Br. of Appellant at 20 (capitalization omitted). But the Monroes accepted the hearing examiner's modification of the City's determination and plat approval. This is not an "issue" in contention, notwithstanding Julian's listing it as such. Julian's discussion regarding this matter is more accurately characterized as background for her next argument,

## I. STANDARD OF REVIEW

█ █ ¶8 LUPA governs judicial review of Washington land use decisions. *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 467, 61 P.3d 1141 (2003). We review questions of law de novo to determine whether the facts and law supported a land use decision. *HJS Dev.*, 148 Wn.2d at 468; *Satsop Valley Homeowners Ass'n v. Nw. Rock, Inc.*, 126 Wn. App. 536, 541, 108 P.3d 1247 (2005) (on review of a superior court's land use decision, Court of Appeals stands in the shoes of superior court and reviews the administrative decision on the record before the administrative tribunal, not the superior court record, reviewing the record and the questions of law de novo to determine whether the facts and law support the land use decision). We review the factual record before the hearing examiner, as he is the local jurisdiction's body or officer in this case with the highest level of authority to make a land use determination. *See* AR § 1, at 6 (identifying the present Garden Creek short plat application as a "Type II development application"); VMC 20.210.020(B)(2) (type II applications are decided by a planning official, any appeal will be heard by a hearing examiner, with further appeal to the superior court pursuant to VMC 20.210.130); VMC 20.210.130(D)(1) (appeal decisions by any review body may be subsequently appealed to superior court within 21 calendar days after the date of decision); *see also* former RCW 36.70C.020(1) (1995); *Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs.*, 151 Wn.2d 279, 288, 87 P.3d 1176 (2004); *HJS Dev.*, 148 Wn.2d at 468; *J.L. Storedahl & Sons, Inc. v. Cowlitz County*, 125 Wn. App. 1, 6, 103 P.3d 802 (2004).

█ ¶9 Julian, as the LUPA petitioner, continues to carry the burden of establishing that the hearing examiner erred under at least one of LUPA's six standards of review. *See Pinecrest Homeowners Ass'n*, 151 Wn.2d at 288. These standards, as enumerated in RCW 36.70C.130(1), are:

---

which is that the hearing examiner should have applied the same buffer to the remaining two open sections of the drainage course.

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

"Standards (a), (b), (e), and (f) present questions of law we review de novo." *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). "Standard (c) concerns a factual determination that we review for substantial evidence supporting it." *Cingular Wireless*, 131 Wn. App. at 768. "Substantial evidence is evidence that would persuade a fair-minded person of the truth of the statement asserted." *Cingular Wireless*, 131 Wn. App. at 768. "Our deferential review requires us to consider all of the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority," which in this case is the hearing examiner. *Cingular Wireless*, 131 Wn. App. at 768. Standard (d)'s clearly erroneous test involves applying the law to the facts. *Cingular Wireless*, 131 Wn. App. at 768. "Under that test, we determine whether we are left with a definite and firm conviction that a mistake has been committed." *Cingular Wireless*, 131 Wn. App. at 768. "Again, we defer to factual determinations made by the highest forum below that exercised fact-finding authority"—the hearing examiner. *Cingular Wireless*, 131 Wn. App. at 768.

¶10 Julian contends that "the [h]earing [e]xaminer used the wrong law, wrongly interpreted the law, misapplied law to fact, and made a decision not based on substantial evidence by exempting the rest of the creek from [the critical areas ordinance] buffer requirements." Br. of Appellant at 3-4.[6] Julian asserts that she is "entitled" to relief under standards (a), (b), (c), and (d) noted above. Br. of Appellant at 36. But we may grant relief only if Julian has carried her burden of establishing that the hearing examiner erred under one of these standards. *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 146 Wn.2d 740, 751, 49 P.3d 867 (2002). Julian's opening brief contains no argument that the hearing examiner engaged in unlawful procedure or failed to follow a required process. Thus she has not met her burden under RCW 36.70C.130(1)(a).[7]

¶11 Julian argues throughout her brief that the 2005 version of the ordinance applies, interpreting the example included therein—of an industrial parking lot and industrial building (impervious surfaces) adjacent to the stream—as limiting and dispositive of the ordinance's application.[8] Ac-

---

[6] Julian's reply brief requests limited relief, seeking remand only for imposition of the 150 foot buffer to the remaining two sections of the 78 feet of open watercourse.

[7] Julian argues for the first time in her reply brief that the hearing examiner improperly sua sponte raised the issue of whether her non-SEPA claims were timely raised, characterizing the examiner's action as an unlawful procedure. This argument is not timely. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (issue raised and argued for the first time in a reply brief is too late to warrant consideration). And in any event, as discussed *supra*, the parties' stipulation and the superior court's March 4 and April 24, 2009, orders resolved the matter of the scope of the LUPA petition and review. The March 4 and April 24, 2009, orders have not been appealed.

[8] Former VMC 20.740.110(A)(1)(e)(4) (2005) stated:

If impervious surfaces from previous development completely functionally isolate the [RMA] or the [RB] from the lake, stream or river, the regulated riparian area shall extend from the ordinary high water mark to the impervious surfaces. An example would be an existing industrial paved area and warehouses in the [RMA] and [RB].

Former VMC 20.740.110(A)(1)(e)(1)(A) (2007) stated:

When impervious surfaces from previous development completely functionally isolate the [RMA] or the [RB] from the waterbody, the regulated riparian area shall extend from the ordinary high water mark to the impervious surfaces. If

cordingly, she contends that the hearing examiner erred by applying former VMC 20.740.110(A)(1)(e)(1)(A) (2007). She also contends that while the hearing examiner properly determined that a 150 foot RMA and RB buffer applied to the open segment of the drainage channel abutting the north property line, the hearing examiner erred by failing to apply the same buffer to the other two open segments of the drainage channel lying further south on the property. Again, she contends that the 2005 version of the ordinance requires such buffer to apply to all three open segments of the drainage channel. We hold that the 2007 version of the ordinance applies.

II. VESTING

¶12 The issue of which ordinance (2005 or 2007) applies turns on the vested rights doctrine as applied in Washington. "In Washington, 'vesting' refers generally to the notion that a land use application, under the proper conditions, will be considered only under the land use statutes and ordinances in effect at the time of the application's submission." *Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 275, 943 P.2d 1378 (1997) (citing *Friends of the Law v. King County*, 123 Wn.2d 518, 522, 869 P.2d 1056 (1994); *Vashon Island Comm. for Self-Gov't v. Wash. State Boundary Review Bd.*, 127 Wn.2d 759, 767-68, 903 P.2d 953 (1995)). "The purpose of vesting is to provide a measure of certainty to developers, and to protect their expectations against fluctuating land use policy." *Friends of the Law*, 123 Wn.2d at 522.

¶13 More than two decades ago, our legislature expanded the common law vesting doctrine to apply to subdivision plat applications by enacting RCW 58.17.033. *Friends of the Law*, 123 Wn.2d at 522. That statute provides in relevant part:

---

the waterbody is not completely physically isolated, but is completely functionally isolated, the Planning Official may adjust the regulated riparian area to reflect site conditions and sound science.

The ordinance was amended again in 2009.

(1) A proposed division of land, as defined in RCW 58.17.020,[9] shall be considered under the subdivision or short subdivision ordinance, and zoning or *other land use control ordinances*, in effect on the land at the time a *fully completed application* for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official.

(2) The requirements for a fully completed application shall be defined by local ordinance.

RCW 58.17.033 (emphasis added). In extending the vested rights doctrine "to include short and long plat applications," our legislature "made the policy decision that developers should be able to develop their property according to the laws in effect at the time they make completed application for subdivision or short subdivision of their property." *Noble Manor*, 133 Wn.2d at 280.

¶14 As for the "completeness" determination, RCW 36.70B.070 additionally provides in pertinent part:

(1) Within twenty-eight days after receiving a project permit application,[10] a local government . . . shall mail or provide in person a written determination to the applicant, stating either:

(a) That the application is complete; or

(b) That the application is incomplete and what is necessary to make the application complete.

. . . .

(2) A project permit application is complete for purposes of this section when it meets the procedural submission requirements of the local government and is sufficient for continued processing even though additional information may be required or project modifications may be undertaken subse-

---

[9] RCW 58.17.020(1) defines "subdivision" as "the division or redivision of land into five or more lots . . . for the purpose of sale, lease, or transfer of ownership, except as provided in subsection (6)." Subsection (6) defines "short subdivision" as "the division or redivision of land into four or fewer lots . . . for the purpose of sale, lease, or transfer of ownership."

[10] " '[P]roject permit application' means any land use or environmental permit or license required from a local government for a project action, including but not limited to . . . subdivisions." RCW 36.70B.020(4).

quently. The determination of completeness shall not preclude the local government from requesting additional information or studies either at the time of the notice of completeness or subsequently if new information is required or substantial changes in the proposed action occur.

. . . .

(4)(a) An application shall be deemed complete under this section if the local government does not provide a written determination to the applicant that the application is incomplete as provided in subsection (1)(b) of this section.

¶15 Here, the Monroes submitted their Preliminary Short Subdivision Application on January 15, 2008. On February 12, 2008, the City issued a timely notice to the Monroes stating that the City had determined their short plat application was "fully complete." AR § 4, Ex. 36, at 1 (boldface omitted). Accordingly, the land use statutes and ordinances in effect on January 15, 2008, are to be applied to the Monroe's short plat application. Thus, we hold that the hearing examiner did not err in applying the 2007 version of VMC 20.740.110(A)(1)(e)(1)(A).[11] This disposition resolves Julian's contention that under the 2005 version of VMC 20.740.110(A)(1)(e)(4), the hearing examiner should have applied a 150 foot buffer to the remaining two open portions of the drainage channel, as well as any other contention applying the 2005 ordinance.

III. APPLICATION OF 2007 ORDINANCE

¶16 Julian next contends that the hearing examiner erred in determining that the two portions of the open drainage course to which the Monroes need not apply a 150 foot buffer were completely functionally isolated under the 2007 ordinance because they retained some beneficial "functions." Br. of Appellant at 27. Julian points to VMC

---

[11] See also VMC 20.210.110(A), which provides that an application vests as to city "land use control ordinances . . . in effect on the date a fully complete application is filed with the city." Also, as noted, the preapplication conference reports additionally advised that vesting would occur when a future "fully completed" type II (short plat) application was filed. AR § 4, Ex. 34, at 23; AR § 4, Ex. 37, at 26; AR § 4, Ex. 35, at 26.

20.740.020(A) for a list of beneficial functions. VMC 20.740-.020(A) is a general provision in the municipal code's critical areas protection chapter that states in part:

> Activity shall result in no net loss of functions and values in the critical areas. Since values are difficult to measure no net loss of functions and values means no net loss of functions. The beneficial functions provided by critical areas include, but are not limited to water quality protection and enhancement; fish and wildlife habitat; food chain support; flood storage; conveyance and attenuation of flood waters; ground water recharge and discharge; erosion control; and wave attenuation. These beneficial functions are not listed in order of priority.

But this ordinance does not advance Julian's argument. The ordinance prohibits only the *net loss* of critical area functions. Here, there are no such losses. In fact, the record shows that the Monroe's proposed site improvements would actually improve the water course's now negligible habitat functions and the hearing examiner correctly so found.[12]

¶17 We are not convinced by Julian's argument that the presence of negligible habitat functions shows that the hearing examiner erred in determining that the remaining

---

[12] The hearing examiner found:

The applicants will remove some of the existing riprap and bank armoring within the channel of the watercourse and install landscape plantings along a portion of the watercourse to provide a buffer between the developed site and the watercourse. See the proposed landscape plan, Sheet 7 of 7. In addition, the applicants will remove several existing culverts and paved areas where the watercourse is currently piped underground. The applicants will "daylight" these sections of the watercourse, creating additional areas of open drainage channel and reducing fragmentation of the watercourse resource on the site. See p 5 of Exhibit 1.2. These measures will mitigate impacts to the drainage course and *improve the habitat functions of the watercourse.*

d. The examiner finds that the proposed development will result in no net loss of critical area functions and values. VMC 20.740.060.D. There is no dispute that this site currently has very limited critical area functions and values and the vast majority of those functions and values are limited to the watercourse channel. See, e.g., Exhibits 4, 5, 17, 18 and 28. The proposed mitigation, removing existing culverts, bank armoring and rip-rap and impervious surfaces, daylighting sections of the watercourse that are currently underground and planting riparian vegetation, will replace any lost functions and ensure that the development results in no net loss, and a potential enhancement, of critical area functions and values.

CP at 46 (emphasis added).

two open portions of the watercourse were completely functionally isolated. The hearing examiner acknowledged that the two sections "may serve some limited riparian function," but he also noted that the sections were "small" and "physically isolated from upstream and downstream riparian areas by existing culverts and other impervious surfaces." CP at 44. Based on these facts and the "multiple environmental analyses in the record," the examiner determined that the two open sections at issue were "completely functionally isolated and a[n] [RMA] and [RB] should not be required consistent with sound science." CP at 44. The 2007 version of VMC 20.740.110(A)(1)(e)(1)(A) expressly permits the planning official to "adjust the regulated riparian area to reflect site conditions and sound science" where the water body in question is not completely physically isolated but is completely functionally isolated. This was not error.

¶18 Julian alternatively argues that there is no real difference between the open portion of the watercourse along the northern property line, where the hearing examiner required a 150 foot RMA and RB buffer, and the two downstream open portions of the watercourse on which the examiner placed no buffer. But the photographic exhibits show that the watercourse above the northern culvert, near the northern property boundary, is a continuation of a larger adjacent off-property riparian area lying north of the lot line. Accordingly, the record supports the hearing examiner's determination.

¶19 The evidence suggests that the habitat value of this watercourse was at best very limited. Where, as here, discrepancies in the evidence concern differences in expert opinions over whether the watercourse's habitat value was little or practically nil, it is particularly appropriate to defer to the agency fact finder. *See* RCW 36.70C.130(1)(b) (allowing for "such deference as is due" the construction of a law by a local jurisdiction with expertise); *cf. Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 845, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) (where agency interpretation " 'represents a reasonable accommodation of conflicting poli-

cies that were committed to the agency's care by the statute, [courts] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned'" (quoting *United States v. Shimer*, 367 U.S. 374, 383, 81 S. Ct. 1554, 6 L. Ed. 2d 908 (1961))); *see also* VMC 20.740.010(A) (purpose of critical areas protection chapter is "to designate and protect ecologically sensitive and hazardous areas (critical areas) and their functions and values, while also allowing for reasonable use of property"). The hearing examiner's determination, based on application of the "completely functionally isolated" test, necessarily entails assessments, balancing, and expertise that counsel deference toward the agency's construction and determination as expressed in the examiner's final order. Given the deference due that construction, we hold that the hearing examiner did not err in applying the "completely functionally isolated" test as articulated in the 2007 version of VMC 20.740.110(A)(1)(e)(1)(A).

¶20 Also, as discussed, although the record contains a variety of viewpoints on the habitat value of the watercourse, there is substantial evidence in the form of expert opinion and photographic exhibits to support the hearing examiner's determination to employ a buffer only on the northern portion of the watercourse. And, in light of that evidence, the hearing examiner's final order is not clearly erroneous. Julian has failed to meet her burden of establishing otherwise.

## IV. ATTORNEY FEES

¶21 The Monroes seek attorney fees under RCW 4.84.370(1) and RAP 18.1.[13] The statute provides in relevant part:

(1) Notwithstanding any other provisions of this chapter, reasonable attorneys' fees and costs shall be awarded to the

---

[13] The Monroes' fee request appears in a separate section of their opening brief with argument and citation to legal authority as required by RAP 18.1.

prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:

(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town, or in a decision involving a substantial development permit under chapter 90.58 RCW, the prevailing party on appeal was the prevailing party or the substantially prevailing party before the shorelines[s] hearings board; and

(b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.

RCW 4.84.370 (alteration in original). "The statute allows reasonable attorney's fees to a party who prevails or substantially prevails at the local government level, the superior court, and before the Court of Appeals or the Supreme Court." *Baker v. Tri-Mountain Res., Inc.*, 94 Wn. App. 849, 852, 973 P.2d 1078 (1999).

¶22 The Monroes ask for fees as the "substantially prevailing" party. Julian responds that a fee award to the Monroes would not be proper because she prevailed on "significant issues" before the hearing examiner and superior court. Reply Br. of Appellant at 21. Julian points to the examiner's imposition of a buffer on the northern open portion of the watercourse and the superior court's denial of the Monroes' preliminary motion to dismiss all of Julian's claims that did not fall under the State Environmental Policy Act, chapter 43.21C RCW.

¶23 Julian is correct that where a party has not prevailed on some major issue, it is not entitled to fees under RCW 4.84.370. *See, e.g.*, *Magnolia Neighborhood Planning Council v. City of Seattle*, 155 Wn. App. 305, 323, 230 P.3d 190, *review denied*, 170 Wn.2d 1003 (2010) (neighborhood

community organization was not entitled to appellate attorney fees in action against city challenging city's plan for federal property that was being disposed of pursuant to Defense Base Closure and Realignment Act of 1990, 10 U.S.C. § 2687, where organization was not the prevailing party on all issues on appeal); *Suquamish Indian Tribe v. Kitsap County*, 92 Wn. App. 816, 832, 965 P.2d 636 (1998) (real estate developers were not substantially prevailing party on appeal of judgment dismissing two land use petitions against developers and county, and thus not entitled to appellate attorney fees, where one petition was found to have been properly dismissed but dismissal of other petition was reversed).

¶24 On the other hand, we have held that "[i]f a party receives a building permit and the decision is affirmed by two courts, they are entitled to fees under this statute." *Nickum v. City of Bainbridge Island*, 153 Wn. App. 366, 383, 223 P.3d 1172 (2009) (citing *Habitat Watch v. Skagit County*, 155 Wn.2d 397, 413, 120 P.3d 56 (2005)). Here the Monroes have substantially prevailed in that they have received what they sought—approval of their short plat. Although the hearing examiner modified the approval by placing conditions on it, the Monroes found those conditions acceptable and did not appeal. Similarly, although the superior court denied the Monroes' preliminary motion regarding a threshold matter, the court affirmed the hearing examiner's substantive decision approving the short plat. Again, the Monroes agreed with that determination and did not seek further review. The Monroes have also prevailed here. Accordingly, because the Monroes have substantially prevailed (i.e., received short plat approval) at the local government level and before two courts, we award them attorney fees under RCW 4.84.370(1). *Nickum*, 153 Wn. App. at 383-84.

## CONCLUSION

¶25 In sum, we hold that the hearing examiner properly applied former VMC 20.740.110(A)(1)(e)(1)(A) (2007). We

634

also grant the Monroes' request for attorney fees under RCW 4.84.370(1) in an amount to be determined by our commissioner upon compliance with RAP 18.1.

WORSWICK, A.C.J., and QUINN-BRINTNALL, J., concur.